**Francesco CALTAGIRONE, Appellant,**

v.

**George V. GRANT, United States Marshal, Appellee.**

**No. 1252, Docket 80–2081.**

United States Court of Appeals, Second Circuit.

Argued June 4, 1980.
Decided June 26, 1980.

Louis A. Craco, New York City (Robert B. Hodes, Brian E. O'Connor, John P. Brooks, Jr., Willkie Farr & Gallagher, New York City, and Edward Bennett Williams, John G. Kester, Kevin T. Baine, Barry S. Simon, William Alden McDaniel, Jr., Williams & Connolly, Washington, D.C., of counsel), for appellant.

Stuart J. Baskin, Asst. U.S. Atty. for the Southern District of New York, New York City (William M. Tendy, U.S. Atty., Frank Maas, Eugene Neal Kaplan, Gregory L. Diskant, Asst. U.S. Attys., New York City, of counsel), for appellee.

Before KAUFMAN, TIMBERS, Circuit Judges, and MISHLER, District Judge.*

IRVING R. KAUFMAN, Circuit Judge:

█ Infamous among the abuses wrought in the eighteenth century by unbounded royal power were *lettres de cachet.* Through them, the king could free—or imprison—upon no more a showing than monarchal whim. Because of them, and numerous other abuses, the Framers of our Constitution resolved to regulate all manner of governmental intrusions and embodied their constraint in one of the starkest provisions of the Bill of Rights: ". . . no Warrants shall issue, but upon probable cause." [1] Decalogical in its brevity and authority, the constitutional proscription serves to this day as a *modus vivendi* for magistrates and judges, and necessarily conditions every governmental seizure. It also provides a canon of judicial construction. When faced with language that may be construed in either of two ways, one conforming to the Framers' command and the other not, courts will choose that construction which comports with the Constitution, and reject the other.

---

* Of the United States District Court for the Eastern District of New York, sitting by designation.

1. U.S.Const., Amend. IV. In full, the Amendment provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

■ It is this principle, and not the constitutional provision itself, which underlies our disposition of the instant appeal. Francesco Caltagirone,[2] an Italian national who was arrested by United States authorities without any showing of probable cause, appeals the denial of his petition for a writ of habeas corpus by the district court. The Government argues that no showing of probable cause was required, pointing to the language of our extradition treaty with Italy, under which Caltagirone was provisionally arrested and held for forty-five days. The treaty language seems to us clearly to require such a showing, however, and we dispose of the case on that ground. We note, though, that to the extent the treaty language is ambiguous, we read it in light of the constitutional provision, and thereby comply with the Framers' intent. *See Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 348, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936) (Brandeis, J., concurring).

I

With his two brothers, Caltagirone once operated the largest real estate development syndicate in Italy. At its height, the syndicate consisted of more than twenty-five corporations, and enjoyed the favor of Italian officials responsible for the provision of credit through a government lending institution, Italcasse. Since the syndicate's constituent corporations were heavily leveraged, and the loans were secured by guarantees among the member corporations, the Italian officials' support was essential to the venture's continued good fortune. A less favorable stance on the part of Italcasse and the entire enterprise might suddenly become vulnerable.

Sometime in 1976 or 1977, a change of government ended the syndicate's access to easy credit, and the complex financial structure began to collapse. With loans coming due and construction projects half-finished, the Caltagirone companies faced a cash squeeze of major proportions. Caltagirone entered intensive negotiations with his creditors, which lasted for three years, but discussions broke down in the fall of 1979, and nineteen Caltagirone companies were declared bankrupt. On February 8 and March 3, 1980, amid rumors in the Italian press that the bankruptcies involved hundreds of millions of dollars, Italian courts issued warrants for Caltagirone's arrest on charges of fraudulent bankruptcy and *concorso in peculato*, that is, participation in embezzlement.[3] Caltagirone, however, had already left Italy for the United States.[4]

Once the Italian government became aware that Caltagirone was in the United States, it notified the State Department, on February 26 and again on March 7, 1980, that warrants had issued in Italy. Then,

2. Francesco Caltagirone is also variously referred to as Francesco Caltagirone Bellavista and Francesco Bellavista Caltagirone, but there is no dispute concerning his identity.

3. The warrants also named Caltagirone's two brothers, Camillo and Gaetano, but only Gaetano was arrested in the United States. Francesco alone is before the Court on this appeal.

Article 216 of the Italian Bankruptcy Law provides in relevant part:

(Fraudulent bankruptcy). A businessman is punished with imprisonment of from three to ten years, if declared to be bankrupt, when he:

1) has distracted, hidden, dissimulated, destroyed or dissipated all or part of his assets or, with the intent of damaging his creditors, has alleged or acknowledged the existence of nonexisting debts;

2) has subtracted, destroyed or falsified, wholly or partly, with the intent of procuring for himself or others an unjust profit or of damaging his creditors, the books and other accounting records or has so kept them as to make it impossible to reconstruct the assets of the transactions of the business.

Article 223 details the circumstances in which the penalties prescribed by Article 216 are applicable to directors and general managers of bankrupt corporations.

For a discussion of the Italian fraudulent bankruptcy statute, *see Matter of Sindona*, 450 F.Supp. 672, 676 79 (S.D.N.Y.1978), *aff'd sub nom. Sindona v. Grant*, 619 F.2d 167 (2d Cir. 1980).

4. The exact date of Caltagirone's appearance in the United States is not in the record, but Caltagirone's counsel at argument stated that Caltagirone had been living in New York since the summer of 1979.

pursuant to Article XIII of its extradition treaty with the United States,[5] it applied to the United States for a "provisional arrest" of Caltagirone pending a possible request for his extradition to Italy. In accordance with the Italian application, the United States Attorney for the Southern District of New York prepared a complaint under oath alleging the existence of the Italian warrants,[6] then applied to Judge Griesa for a warrant of arrest. The United States Attorney made no showing before Judge Griesa, or before any other judicial officer, to establish probable cause to believe a crime had been committed in Italy, or that Caltagirone had committed it. Nontheless, Judge Griesa issued a warrant for Caltagirone's arrest on Thursday, March 20, 1980, and agents of the FBI arrested Caltagirone the following day.

On the day of his arrest, Caltagirone appeared before Judge Cannella and moved to quash the warrant issued by Judge Griesa on the ground, *inter alia*, that it was issued without probable cause. Judge Cannella denied Caltagirone's motion to quash, reasoning that "the action by Judge Griesa in granting the warrant of arrest constitutes . . . a finding by him that the extradition [sic] request was in proper form. This continues to be the law of the case." In the

alternative, Caltagirone moved to be released on bail. Judge Cannella, however, was "not satisfied [Caltagirone] would return for the extradition hearings" and denied the motion, ordering Caltagirone to be held without bail.

Three days later, on March 24, Caltagirone renewed his two motions before Judge Cannella. In addition, he petitioned the district court for a writ of habeas corpus pursuant to 28 U.S.C. § 2241.[7] On March 26 Judge Cannella denied both the motion to vacate the warrant and the petition for habeas relief on the ground that Caltagirone's arrest in the United States was presumptively valid under Italian law. Noting the many differences between Italian and American law, Judge Cannella nonetheless stated that an Italian "magistrate has the right to issue a warrant of arrest when certain bankruptcy frauds are alleged to him. There is no dispute than such warrants were issued by Italian magistrates. . . . This Court cannot and will not second-guess the judgment of the magistrate." *In the Matter of Caltagirone*, 80 Cr.Misc. No. 1 (S.D.N.Y. Mar. 26, 1980). Judge Cannella also denied bail. Caltagirone appealed immediately, and the case came before this panel.[8]

---

5. Treaty of Extradition, Jan. 18, 1973, United States-Italy, 26 U.S.T. 493; T.I.A.S. No. 8052 [hereinafter cited as "Treaty"]. Under Article XIII, a formal request for extradition is not necessary to authorize a "provisional arrest." Rather, either nation may simply ask the other signatory to hold a suspect for forty-five days pending a decision by the requesting party to seek formal extradition under Article XI of the Treaty.

6. Counsel for Caltagirone asserted at argument that the first Italian warrant had been invalidated by an Italian appellate court for a jurisdictional defect, but did not deny that a second Italian warrant for Caltagirone's arrest remained outstanding, nor did he contest the factual accuracy of Judge Cannella's finding that Caltagirone was sought pursuant to a valid Italian warrant at the time of his provisional arrest in the United States. In light of the facts found by Judge Cannella and conceded by Caltagirone, the only issue before us on this appeal is the legality of Caltagirone's provisional arrest in the United states. Accordingly, we need not unravel the entangled procedural history of the Italian warrants.

7. 28 U.S.C. § 2241(a) gives district courts the power to grant writs of habeas corpus, and § 2241(c) provides, in relevant part:

(c) The writ of habeas corpus shall not extend to a prisoner unless—
(3) He is custody in violation of the Constitution or laws or treaties of the United States
. . . ..

8. Caltagirone filed two notices of appeal, one appealing from the March 26 order insofar as it denied the motion to vacate the warrant or admit Caltagirone to bail, and the other challenging the denial of his petition for a writ of habeas corpus. He then moved to expedite both appeals and, on March 28, 1980, a panel of this Court heard arguments on the motions. With respect to the appeal from Judge Cannella's denial of bail, the panel granted the motion to expedite, and summarily affirmed the district court's March 26 order denying bail, but directed Judge Cannella to hold a hearing on April 3 to consider bail. He did so, and released Caltagirone on conditions agreed to by the parties. The panel reserved decision on all other aspects of the motions to expedite, how-

## II

Article XIII of the Treaty provides that an application for provisional arrest must contain four elements: a description of the person sought; an indication of intent formally to request the extradition of the person; an allegation that a warrant for the person's arrest has been issued by the requesting state; and, finally, "such further information, if any, as would be necessary to justify the issue of a warrant of arrest had the offense been committed . . . in the territory of the requested Party."[9] Since the "requested Party" in the instant case is the United States, the sufficiency of the information provided to support Caltagirone's arrest must necessarily be judged by American law. *Jhirad v. Ferrandina*, 536 F.2d 478, 485 (2d Cir.), *cert. denied*, 429 U.S. 833, 97 S.Ct. 97, 50 L.Ed.2d 98 (1976). The district court, however, simply noted that an Italian warrant of arrest was outstanding, and then refused to "second-guess" the Republic of Italy's determination that a warrant should issue. Apparently, the district court saw no need to determine whether a sufficient showing had been made to support an arrest under United States law.[10]

## A

The Treaty does not contemplate a review of the validity, under Italian law, of the Italian arrest warrants, but rather a simple factual determination whether a warrant has been issued. In this limited sense, deference to a foreign judicial determination is entirely proper. It is quite another matter, however, to assert that the Republic of Italy's decision to apply for provisional arrest will be taken as an unreviewable determination that the application conforms to all Treaty provisions. This is particularly true with respect to the "further information" requirement, since we cannot suppose that the drafters intended that an official of the requesting state would make a final determination of the law of the requested party. We proceed, therefore, to the application of United States standards for arrest and detention.

Had the offense of "fraudulent bankruptcy" been committed in the United States,[11] a showing of probable cause would have been necessary to justify the issuance of an arrest warrant. *See* Fed.R.Crim.P. 4; *Whiteley v. Warden*, 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971); *Giordenello v. United States*, 357 U.S. 480, 78 S.Ct. 1245, 2 L.Ed.2d 1503 (1958). Nonetheless, the Government concedes, and our examination

ever, noting that it would not consider the merits of either appeal absent fuller briefing by the parties. On April 16 the Clerk of the Court entered an accelerated briefing schedule for the appeal from the denial of Caltagirone's habeas petition. It was subsequently assigned to this panel.

9. Article XIII provides in relevant part:
   In case of urgency a Contracting Party may apply for the provisional arrest of the person sought pending the presentation of the request for extradition through the diplomatic channel. . . . The application shall contain a description of the person sought, an indication of intention to request the extradition of the person sought and a statement of the existence of a warrant of arrest . . . against that person, and such further information, if any, as would be necessary to justify the issue of a warrant of arrest had the offense been committed . . . in the territory of the requested Party.

   . .     .     .     .     .

   A person arrested upon such an application shall be set at liberty upon the expiration of

forty-five days from the date of his arrest if a request for his extradition accompanied by the documents specified in Article XI shall not have been received.

10. Judge Cannella also deferred to Italian practice in rejecting Caltagirone's argument below that language in Article XIII—"In case of urgency"—requires the Government to show urgency before securing a warrant, and that no such urgency was shown here. Judge Cannella decided that the Government of Italy in applying for the warrant must have found present whatever urgency was required under Article XIII, and he refused to review its determination. While we have reservations concerning Judge Cannella's reluctance to review, we need not reach this question, because we reverse the district court on other grounds.

11. The conduct proscribed in Italy by Article 216 of the Italian Fraudulent Bankruptcy Law, *supra* note 3, is prohibited in the United States by 18 U.S.C. §§ 152, 656, and 1006.

of the record confirms, that no showing of probable cause was made prior to the issuance of the March 20 warrant commanding Caltagirone's provisional detention. Indeed, Italy's application for appellant's provisional arrest contained no "such, further information" as would establish probable cause to believe that Caltagirone had committed an extraditable offense. Though the Senate report prepared in conjunction with the Treaty's ratification is short, it demonstrates clearly that our legislators contemplated all applications for provisional arrest to be "accompanied by appropriate supporting evidence." S.Rep. No. 93–19, 93d Cong., 1st Sess., reprinted in 119 Cong. Rec. 32054 (1973). Here, however, none was provided.

■ Conceding the defect, the Government urges an alternative construction of the Treaty. It agrees that Italy must provide such "further information" as would establish probable cause to believe that Caltagirone had committed an extraditable offense, but argues that the information must be supplied only to the executive branch, and need never be presented to an American magistrate. In our view, the Government's construction strains not only the text of our Treaty with Italy, but the entire

diplomatic and statutory backdrop against which Article XIII was drafted.

■ The language of Article XIII closely tracks the text of Article XI, the Treaty article governing formal requests for extradition.[12] That article expressly requires all requests for extradition to provide "such evidence as . . . would justify [the relator's] arrest and committal for trial if the offense had been committed [in the territory of the requested party] . . ." Article XIII, in turn, requires applications for provisional arrest to set forth "such further information as would be necessary to justify the issue of a warrant of arrest had the offense been committed . . . in the territory of the requested Party." Clearly, the parallelism was intended by the Treaty's draftsmen, and this suggests that in all cases where the United States is the "requested Party", a showing of probable cause is required under both articles.

Article XI does not expressly provide for presentation of the "evidence" establishing probable cause to a magistrate or judge, presumably because 18 U.S.C. § 3184 already requires such a proceeding in all formal requests for extradition.[13] The Government acknowledges that § 3184 im-

---

12. Article XI provides in relevant part:
   The request for extradition shall be made through the diplomatic channel.
   The request shall be accompanied by a description of the person sought, a statement of the facts of the case, the text of the applicable laws of the requesting Party including the law defining the offense, the law prescribing the punishment for the offense, and the law relating to the limitation of the legal proceedings or the enforcement of the penalty for the offense.
   When the request relates to a person who has not yet been convicted, it must also be accompanied by a warrant of arrest issued by a judge or other judicial officer of the requesting Party and by such evidence as, according to the laws of the requested Party, would justify his arrest and committal for trial if the offense had been committed there, including evidence proving that the person requested is the person to whom the warrant of arrest refers.

   . . . . .
   The warrant of arrest and deposition or other evidence, given under oath . . . or certified copies of these documents, shall

be admitted in evidence in the examination of the request for extradition when, in the case of a request emanating from Italy, they bear the signature or are accompanied by the attestation of a judge, magistrate or other official or are authenticated by the official seal of the Ministry of Justice and, in any case, are certified by the principal diplomatic or consular officer of the United States in Italy, . . . . .

13. 18 U.S.C. § 3184 provides in part:
   Whenever there is a treaty or convention for extradition between the United States and any foreign government, any . . . judge of the United States . . . may, upon complaint made under oath, charging any person found within his jurisdiction, with having committed within the jurisdiction of any such foreign government any of the crimes provided for by such treaty . . . , issue his warrant for the apprehension of the person so charged, that he may be brought before such . . . judge, or magistrate, to the end that the evidence of criminality may be heard and considered. If, on such hearing, he deems the evidence sufficient to

**746**

poses a probable cause requirement as a precondition of formal extradition under Article XI, but claims that the cited language in Article XIII serves simply to create a power in the requested party to demand additional information in provisional arrest proceedings. To contend that § 3184's requirement of a "hearing" before a judge or magistrate applies to one article, but not the other, especially when their language is so similar, is untenable. Moreover, where the Treaty authorizes intergovernmental communications, it does so expressly, and not through indirection. Thus, for example, Article XIV of the Treaty specifically provides for demands by the requested party for additional "evidence or information." [14]

> sustain the charge under the provisions of the proper treaty or convention, he shall certify the same, together with a copy of all the testimony taken before him, to the Secretary of State, that a warrant may issue upon the requisition of the proper authorities of such foreign government, for the surrender of such person, according to the stipulations of the treaty or convention; and he shall issue his warrant for the commitment of the person so charged to the proper jail, there to remain until such surrender shall be made.

**14.** In its reference to "evidence or information," Article XIV includes both Article XI and Article XIII within its scope: an Article XI request contains "evidence," and an Article XIII application contains "information." Therefore Article XIV may be read to cover requests for further information in provisional arrest proceedings and, if this is so, the Government's reading of Article XIII's "further information" requirement would render the requirement mere surplusage.

**15.** *E. g.*, Treaty on Extradition, May 24, 1973, United States-Paraguay, 25 U.S.T. 967; T.I.A.S. No. 7838; Treaty on Extradition, Jan. 21, 1972, United States-Argentina, 23 U.S.T. 3501; T.I.A.S. No. 7510. The treaty in *United States ex rel. Petrushansky v. Marasco*, 325 F.2d 562 (2d Cir. 1963), *cert. denied*, 376 U.S. 952, 84 S.Ct. 969, 11 L.Ed.2d 971 (1964), also lacked any informational requirement, so it in no way controls our decision here.

**16.** *E. g.*, Treaty on Extradition, June 22, 1972, United States-Denmark, 25 U.S.T. 1293; T.I.A.S. No. 7864; Treaty on Extradition, Jan. 12, 1970, United States-New Zealand, 22 U.S.T. 1; T.I.A.S. No. 7035.

Our reading of Article XIII is buttressed further by the existence of other American extradition treaties authorizing provisional arrest in "urgent" cases, but requiring no additional information from the applying state to support the arrest.[15] Accordingly, the provisional arrest provisions of American treaties fall into two groups: those with the informational requirement,[16] and those without it. The availability of the choice [17] leads us to attach importance to the difference, and confirms our view that the drafters of Article XIII intended to require the presentation of "such further information" needed to justify an arrest as a necessary condition for provisional arrest.[18]

**17.** International practice has supported both schemes. *Compare* 4 G. Hackworth, Digest of International Law 104‑ 05 (1942) (requiring supporting information) *with* 2 F. Wharton, International Law Digest 811 12 (1886) (requiring mere allegation of warrant). *See generally* 6 M. Whiteman, Digest of International Law 920 35 (1968); 1 Harvard Research on International Law 179 82 (1935); 4 J. Moore, International Law Digest 382 84 (1906).

**18.** The Government submitted to the district court an affidavit from Knute E. Malmborg, Jr., Assistant Legal Advisor for Management of the State Department. Malmborg stated that the Italian application of March 7 was "in order and in accordance with the terms of the extradition treaty between the United States and Italy." Affidavit of K. E. Malmborg, Jr., at ' 1. While normally the treaty interpretation of the executive is due some weight, *Factor v. Laubenheimer*, 290 U.S. 276, 54 S.Ct. 191, 78 L.Ed. 315 (1933), we reject Malmborg's view here. We do so largely, of course, because it conflicts with the clear import of Article XIII, but we note also that elsewhere in his affidavit Malmborg states that provisional arrest is "a normal part of the extradition process," ·Affidavit of Knute E. Malmborg, Jr., at ' 2, and that the United States "commonly requests [it]," *id.* at ' 4. In the Treaty negotiations between the United States and Italy, the United States delegation "noted that, in fact, the provisional arrest procedure was rarely used in the United States." Dep't of State, Minutes of Extradition Negotiations between the United States and Italy, May 11–22, 1970, at 10. The apparent contradiction seems to indicate Malmborg's unfamiliarity with the drafting of the Treaty, and we discount his "executive interpretation" accordingly. *Cf. Galanis v. Pallanck*, 568 F.2d

■ Perhaps in recognition of Article XIII's plain meaning, the Government urges us to ignore its text, and to refer instead to the Treaty's overall structure. Noting the existence of a requirement of probable cause in Article XI, the Government contends that the drafters of the Treaty could not have intended the similar language in Article XIII to require probable cause as well, since to do so would eradicate the intended distinctions between the two procedures. We do not find, however, that our construction of the Treaty will undercut Article XIII's purpose to provide a more streamlined mechanism for accommodating applications from foreign nations than full-blown extradition proceedings now require.

Article XI and Article XIII both require a showing of probable cause, but the proceedings they contemplate are different in several crucial respects. Article XIII requires "information," and lists no formalities attending its provision by the applying state. Written within the last ten years, the article clearly contemplates that an application for provisional arrest might be made wholly by telecommunications, since time is of the essence in an "urgen[t]" case. Article XI, on the other hand, requires "evidence," a word which necessarily implies a greater degree of formality in procedures than "information." Unlike Article XIII, Article XI requires both certified depositions establishing probable cause and a copy of the actual warrant of arrest issued by the magistrate in the requesting state. Further, while Article XIII allows communications between Italian and American law enforcement officials directly, Article XI requires that both the depositions and the warrant pass first through diplomatic channels (for official certification), and then be relayed to law enforcement officials in the requested state. Moreover, under Article XI the requesting states must "prov[e]," not allege, that the relator is the person named in the warrants, and must provide an extensive documentary appendix to its request setting forth, *inter alia*, its law defining the offense, prescribing the punishment, and setting the time period in which charges may be brought. Though the Government persuasively suggests that the provisional arrest and extradition proceedings must differ in some way, the difference does not lie in the requirement of probable cause. The Treaty's draftsmen clearly intended to streamline the Article XI arrest procedure in urgent cases, but not by sacrificing the protection of the probable cause requirement.

**B**

The overwhelming evidence that Article XIII itself prohibits provisional arrest without probable cause relieves us of the need to examine the constitutional propriety of a treaty that purports to permit such arrests. But one factual aspect of the Government's claimed practice under Article XIII leads us to comment. According to the Government, the United States may detain Caltagirone for forty-five days with no showing of probable cause. Caltagirone, however, enjoys no guarantee that his detention will end even then.

■ In *Collins v. Loisel,* 262 U.S. 426, 43 S.Ct. 618, 67 L.Ed. 1062 (1923), the Supreme Court held that an extradition proceeding which ends in the relator's release from custody does not bar a subsequent extradition demand by the requesting state on the same charge. Should Italy's current extradition attempt fail, Article XIV of the Treaty specifically provides that a second may be initiated. Thus, if the Government fails to establish probable cause in the proceeding now pending in the district court, it may nonetheless seek the immediate rearrest of Caltagirone on the same charge. Indeed, counsel for the Government readily

234, 239 (2d Cir. 1977) (court rejects Malmborg's interpretation of extradition treaty with Canada). Further, Malmborg's interpretation of the Treaty in his affidavit is inconsistent with the State Department's construction of identical language in the provisional arrest pro-

visions of other extradition treaties. *See, e. g.,* Dep't of State, 1977 Digest of United States Practice in International Law 156; Dep't of State, 1975 Digest of United States Practice in International Law 175 76.

conceded at argument that he would seek Caltagirone's rearrest should the present extradition request be denied. Thus, in the Government's view, a foreign state could apply for, and the Government could effect, the unlimited detention of Caltagirone by stringing together an infinite strand of forty-five day provisional arrests, all without a judicial determination of probable cause, or a formal extradition request. This elaboration of the Government's view raises grave questions concerning the constitutional propriety of any interpretation of Article XIII which does not require a showing of probable cause. *United States v. Williams*, 480 F.Supp. 482, 486 (D.Mass.) (expressing reservations as to the constitutionality of thirty-day provisional arrest detention without showing of probable cause), *reversed on other grounds*, 611 F.2d 914 (1st Cir. 1979) (per curiam); *Ex parte La Mantia*, 206 F. 330, 331 (S.D.N.Y.1913) (reserving the issue since probable cause was present). *See also Rosado v. Civiletti*, 621 F.2d 1179, 1195 (2d Cir. 1980) (dictum) ("to the extent that the United States itself acts to detain a relator pending extradition, it is bound to accord him due process"), *citing Grin v. Shine*, 187 U.S. 181, 184, 23 S.Ct. 98, 99, 47 L.Ed. 130 (1902).[19]

■ Moreover, since the Treaty by its terms applies both to aliens and to Americans, the arguably lesser rights accorded aliens, *see, e. g., Mathews v. Diaz*, 426 U.S.

67, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976), cannot provide a complete answer. Indeed, the Government, if its view were accepted, could arrest and indefinitely detain American citizens upon no more than an allegation by a foreign government that a warrant for the citizen was outstanding. We doubt that the tenuous relationship between an application for provisional arrest and a subsequent request for extradition[20] implicates a sufficiently strong foreign policy interest in the executive to justify such a departure from usual Fourth Amendment protections. *See Reid v. Covert*, 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957). Under our historic mandate to construe ambiguous enactments in a manner that comports with the Constitution, *Kent v. Dulles*, 357 U.S. 116, 128–30, 78 S.Ct. 1113, 1119–1120, 2 L.Ed.2d 1204 (1958), we would be loath to permit any construction of the Treaty that could be read to support the purported practice to which we have just alluded. *See NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979). In our view, the language of Article XIII so clearly demands a showing of probable cause before any warrant for provisional arrest may issue, that we need not reach the constitutional question. *Nunquam decurritur ad extraordinarium sed ubi deficit ordinarium.* (We must not resort to the extraordinary until the ordinary fails.)

---

**19.** The constitutional concerns are not resolved by our earlier holdings that the Sixth Amendment guaranty of a speedy trial, *Jhirad v. Ferrandina*, 536 F.2d 478, 485 n. 9 (2d Cir.), *cert. denied*, 429 U.S. 833, 97 S.Ct. 97, 50 L.Ed.2d 98 (1976), or the Fifth Amendment guaranty against double jeopardy, *United States ex rel. Bloomfield v. Gengler*, 507 F.2d 925, 927 (2d Cir. 1974), do not apply to extradition proceedings. The Sixth Amendment by its terms applies only to "criminal prosecutions," and an extradition proceeding is not a "criminal prosecution." *Jhirad v. Ferrandina, supra*, at *id.* The Double Jeopardy Clause applies only to trials, and an extradition proceeding is not a trial. *Collins v. Loisel, supra*, 262 U.S. at 429, 43 S.Ct. at 619. The Fourth Amendment, however, is not so limited. In *Rosado v. Civiletti, supra*, 621 F.2d at 1195 ·96, we stated that, "although the Constitution cannot limit the power of a foreign sovereign to prescribe pro-

cedures for the trial and punishment of crimes committed within its territory, it does govern the manner in which the United States may join the effort." Our holding in *Petrushansky, supra* note 15, is not to the contrary, because evidence establishing probable cause was produced there, and the Fourth Amendment point seems not to have been raised.

**20.** The relationship is tenuous because, under Article XIII, the applying state is not required to follow its application for provisional arrest with a formal request for extradition. The applying state must recite in its Article XIII application an *intent* to request extradition, but the request itself is not explicitly required. Moreover, an applying state's failure to request extradition at the end of the forty-five day detention does not bar it from later applications for provisional arrest.

## III

For its final argument, the Government looks to events occurring after the provisional arrest and urges that Caltagirone's appeal be dismissed as moot. It notes that when the forty-five day period of provisional detention prescribed by Article XIII ended on May 5, the Republic of Italy formally requested Caltagirone's extradition under Article XI of the Treaty. The United States Attorney duly filed a formal extradition complaint, and Judge Cannella issued a new warrant for Caltagirone's arrest, which he then stayed pending Caltagirone's voluntary appearance. On May 6, Caltagirone voluntarily appeared in the district court, was advised that a complaint formally requesting his extradition had been filed pursuant to Article XI, and was then released on bail under conditions identical to those previously imposed for his provisional detention under Article XIII.[21] In the Government's view, the second arrest warrant, issued pursuant to Article XI, superseded the warrant and district court order provisionally detaining Caltagirone under Article XIII, so that any relief accorded appellant from his first arrest cannot possibly free him from confinement under the second. Were the Government's projected sequence of events—"provisional" arrest under Article XIII, leading to "extradition" arrest under Article XI, and finally to formal extradition of the relator to the requesting state—the only possible one under the Treaty, we would do no more than cite *DeFunis v. Odegaard*, 416 U.S. 312, 319, 94 S.Ct. 1704, 1707, 40 L.Ed.2d 164 (1974) (per curiam),[22] and dismiss the appeal. But the law of extradition, and especially the terms of the particular treaty here at issue, con-

vince us that Caltagirone's provisional arrest is so clearly "capable of repetition, yet eva[sion of] review," *Roe v. Wade*, 410 U.S. 113, 125, 93 S.Ct. 705, 713, 35 L.Ed.2d 147 (1973), that the controversy is alive and properly before us.

The Government does not seriously contend that the forty-five day provisional arrest was sufficiently lengthy to permit effective judicial review. Indeed, the sequence of events in this litigation amply demonstrates that this argument does not have merit. Caltagirone moved to vacate the warrant the same morning he was arrested, Friday, March 21. He was back in court on Monday with a memorandum of law in support of that motion. On Monday he also filed his habeas claim, and argued both the motion and the petition that day. On Wednesday, March 26, Judge Cannella issued his order denying relief and, on Thursday, Caltagirone appealed. On Friday, March 28—exactly one week after his arrest—Caltagirone brought his case before this Court.

On that day, counsel for Caltagirone declared himself ready to argue the merits of the habeas appeal, but the panel, wisely we believe, considered only the appeal from Judge Cannella's denial of bail. Despite motions by the Government to extend the briefing schedule and to delay consideration of the merits, Caltagirone pursued his accelerated appeal, and this panel heard oral argument on June 4. We now decide the case on June 26—97 days after Caltagirone's arrest, 22 days after oral argument, and 52 days after appellant's provisional detention ended. In a court which prides itself on its prompt expedition of appeals, Caltagirone's provisional arrest has in fact

---

**21.** A hearing on the sufficiency of the extradition complaint was originally scheduled by Judge Cannella for June 5, 1980, then subsequently adjourned indefinitely pending disposition of the instant appeal.

**22.** In *DeFunis*, a law school applicant challenged admissions requirements at the University of Washington Law School. At the time the Supreme Court decided the case, DeFunis

was in his final quarter of law school, and obviously would never apply to law school again. The Court dismissed his case as moot. Were we as certain that Caltagirone would never again encounter provisional arrest under Article XIII of the Treaty, dismissal would also be proper here. But, we have already recited events that might induce further provisional arrests.

evaded review within the Treaty's forty-five day period of confinement. *See Gerstein v. Pugh*, 420 U.S. 103, 110 n. 11, 95 S.Ct. 854, 861, 43 L.Ed.2d 54 (1975).[23]

Provisional arrest is also capable of repetition. The Government maintains that Caltagirone could not be provisionally arrested again, since a formal request for his extradition has been made and is currently pending in the district court. It urges that if Caltagirone ultimately is extradited pursuant to that request, he would have to return from Italy to the United States, and Italy would have to invoke the Treaty once again, before he could be rearrested pursuant to Article XIII. This possibility is indeed too remote and hypothetical to create the "reasonable expectation" of a recurrence required to support review. *See Weinstein v. Bradford*, 423 U.S. 147, 149, 96 S.Ct. 347, 348, 46 L.Ed.2d 350 (1975) (per curiam).[24]

If, however, the extradition proceeding in the district court results in Caltagirone's release—either because the documents appended to the Italian request do not establish probable cause to believe he has committed an extraditable offense in Italy, *Shapiro v. Ferrandina*, 478 F.2d 894, 901 (2d Cir.), *petition for cert. dismissed by agreement of the parties*, 414 U.S. 884, 94 S.Ct. 204, 38 L.Ed.2d 133 (1973), or because the Secretary of State declines in his discretion to extradite Caltagirone[25]—this case takes on a decidedly different cast. In view of the Government's persistent allegation below that Caltagirone desires to flee the United States, we do not doubt that it will seek his rearrest under Article XIII should the pending extradition complaint be denied. Under Article XIV of the Treaty and *Collins v. Loisel, supra*, it enjoys a broad power to do so. Such rearrest would almost certainly be pursuant to the provisional procedure of Article XIII, rather than the more cumbersome procedure of Article XI, for the provisional request could be made immediately, by diplomatic telex, without the substantial documentation required by Article XI.[26] In light of this "reasonable expectation," *Weinstein, supra*, we conclude the case is not moot.

Accordingly, the judgment of the district court is reversed, and the cause is remanded for further proceedings consistent with this opinion.

---

**23.** The Government also argues that while the validity of Caltagirone's provisional arrest evaded review in this instance, Caltagirone's experience in briefing the issues involved will permit an appellate adjudication within the forty-five day period should the provisional arrest recur. Aside from failing to rebut Caltagirone's showing that the provisional arrest proceeding did in fact evade review this time, the Government's novel argument seems to assume that Caltagirone's next provisional arrest would take place within the same circuit and come before the same panel, that the arrest would take place within the same judicial district within the circuit (permitting the United States Attorney to re-use his briefs, just as Caltagirone purportedly could), and that the court would grant—and the Government would not frustrate—expedition of the appeal. Surely the Government assumes too much.

**24.** *See also Roe v. Wade, supra* (requiring only a possibility of recurrence).

**25.** *See Sindona v. Grant, supra* note 3, 619 F.2d at 174; *In re Stupp*, 23 Fed.Cas. 2812 (No. 13562) (C.C.S.D.N.Y.) (decided under Section 5270 of the Revised Statutes, reenacted in relevant part as § 3184); 4 G. Hackworth, Digest of International Law § 334 (1942). *See also Gallina v. Fraser*, 278 F.2d 77, 79 (2d Cir.), *cert. denied*, 364 U.S. 851, 81 S.Ct. 97, 5 L.Ed.2d 74 (1960). *See generally Note*, Executive Discretion in Extradition, 62 Col.L.Rev. 1313 (1962).

**26.** For a description of the cumbersome formalities required by Article XI but not by Article XIII, *see* Part II–A, *supra*.