**In the Matter of the EXTRADITION OF Timothy Mark Depakakibo GARCIA.**

**No. 09 Crim. Misc. 01.**

United States District Court, S.D. New York.

April 28, 2009.

---

**18.** Postictal means "[f]ollowing a seizure." *Stedman's.*

---

### MEMORANDUM DECISION AND ORDER

FRANK MAAS, United States Magistrate Judge.

On March 5, 2009, relator Timothy Mark Depakakibo Garcia ("Garcia") was provisionally arrested pursuant to Article 9 of the extradition treaty between the United States and the Republic of the Philippines ("Philippines" or "Republic"), Extradition Treaty, U.S.-Phil., art. 9, Nov. 13, 1994, U.N.T.S. 34127 ("Treaty"). Garcia currently is detained at the Metropolitan Detention Center ("MDC"), but seeks to be released on bail pending an anticipated formal request from the Philippines for his extradition. He contends that "myriad special circumstances" support his release and that his continued detention is unlawful because there was no "urgency" under Article 9 of the Treaty to support his provisional arrest. (*See* letter to the Court from James Kousouros, Esq. ("Mr.Kousouros"), dated Mar. 7, 2009 ("Kousouros Letter I"), at 4, 6). For the reasons set forth below, I conclude that Garcia's request for bail must be denied.

### I. *Background*

Garcia was born on August 20, 1983, in Quezon City, Philippines, and resided there until 1986, from 1989 to 1993, and from 1996 to 2003. (*Id.* at 11–12). In the intervening years, Garcia and his family lived in Westerville, Ohio, and Monterey, California, while his father, Major General Carlos Garcia ("General Garcia"), a Philippines official, underwent training and was stationed at military bases. (*Id.* at 3, 11). After returning to the Philippines in 1996, Garcia completed high school and college; he then returned to the United States in 2003. (*Id.* at 12).

Garcia is a United States citizen and currently resides in New York City in a condominium apartment that he and his mother jointly purchased in 2004. (*Id.* at 4, 12). That same year, the United States instituted a lawsuit in this District seeking the forfeiture of Garcia's and his mother's interest in that apartment on the theory that it constituted the proceeds of money laundering. *United States v. All Right, Title and Interest in Real Property and Appurtenances Located at Trump Park Avenue Condominium, Unit 6A,* 04 Civ. 8918(RJH) (Docket No. 1) (Complaint). In that action, the parties subsequently agreed to a standstill arrangement, pursuant to which Garcia was granted the right to reside in the apartment subject to certain conditions until further order of the Court. *Id.* (Docket No. 14) (Occupancy Stipulation and Order). It appears undisputed that he continued to live there until the date of his arrest.

On February 28, 2006, a judge in Quezon City issued an Order of Arrest for Garcia based on an information which charged that members of his family and others unknown had committed the crime

of Plunder in violation of Republic Act No. 7080, as amended. (Kousouros Letter I at 3; letter to the Court from Ass't U.S. Att'y Daniel P. Chung ("AUSA Chung"), dated Mar. 11, 2009 ("Chung Letter"), Ex. A). In the information, the Acting Deputy Special Prosecutor in Quezon City charged that from 1993 through late 2004, General Garcia and his family had received in excess of 300 million pesos (approximately 6 million dollars) from government contractors and others in the form of kickbacks and similar payments, the existence of which was concealed from the Republic. (*See* Chung Letter at 2 & Ex. A). The Republic contends that Garcia and his mother received some of these funds via wire transfer to their bank accounts at Citibank and used them to acquire the New York City apartment. (*Id.* at 2, 4).

Three years after the Order of Arrest was issued, the Philippines Government sent the United States Department of Justice a letter, dated February 27, 2009, requesting the provisional arrest of Garcia, his brothers, and his mother, "with view toward extradition." (*Id.* Ex. B at 1).[1] On March 5, 2009, Magistrate Judge Katz signed a warrant authorizing the provisional arrest of Garcia. (Kousouros Letter I Ex. A). Garcia was arrested the same day; he subsequently was detained on consent pending the submission of a bail application. (Chung Letter at 2).

Garcia appeared before me on March 12, 2009, for a bail hearing. The hearing was attended by Garcia's "aunts, uncles, [and] cousins" as well as a neighbor who was willing to sign a bond to secure his release. (Mar. 12, 2009, Tr. ("Tr.") at 19). At the conclusion of the hearing, I reserved judgment regarding Garcia's application for bail. Thereafter, on March 13, 2009, the Government submitted an additional letter with respect to the issue of "urgency"

raised at the hearing. Garcia submitted responsive papers dated March 16, 2009. Both sides also have sent me additional letters concerning conditions at the MDC.

## II. *Discussion*

### A. *Applicable Law*

Article 9 of the Treaty provides that, "*[i]n case of urgency,* a Contracting Party may request the provisional arrest of the person sought pending presentation of the request for extradition." Treaty, art. 9, ¶ 1 (emphasis added). Article 9 further provides that a person who has been provisionally arrested "may" be discharged from custody after sixty days if a formal request for extradition has not been received. *Id.* ¶ 4.

▉ In extradition cases, there is a presumption that bail should not be granted absent "special circumstances." *See Wright v. Henkel,* 190 U.S. 40, 63, 23 S.Ct. 781, 47 L.Ed. 948 (1903); *United States v. Leitner,* 784 F.2d 159, 160 (2d Cir.1986) (per curiam). Such special circumstances are found "only in the most pressing circumstances, and when the requirements of justice are absolutely peremptory." *Leitner,* 784 F.2d at 160 (quoting *In re Mitchell,* 171 F. 289, 289 (S.D.N.Y.1909)). The rationale for the presumption against bail is the United States Government's overriding interest in complying with its treaty obligations. *Matter of Extradition of Ernst,* No. 97 Crim. Misc. 1 pg. 22, 1998 WL 51130, at * 13 (S.D.N.Y. Feb.5, 1998). As the Supreme Court has explained, if a relator were released on bail and thereafter absconded, the United States might be subjected to "serious embarrassment" in its international relations. *Wright,* 190 U.S. at 62, 23 S.Ct. 781.

---

1. The request letter indicates that two of the Garcias were arrested in San Francisco on February 26, 2009, on "bulk cash smuggling" charges. (Id. Ex. B at 2).

## B. *Special Circumstances*

Garcia asserts that several special circumstances warrant his release on bail. He argues that: (1) the Philippines failed to provide the substantiation that would be required to seek his arrest under Rule 4 of the Federal Rules of Criminal Procedure ("Rule 4"), and his continued detention therefore violates his Eighth Amendment rights (see Kousouros Letter I at 5–6); (2) the complexity of the charge against him suggests that the extradition proceedings will be lengthy (*id.* at 9); (3) his "claims" have a high probability of success on the merits (*id.* at 10–11); (4) there is no diplomatic necessity for his detention (*id.* at 10–11); (5) his personal history and lack of any criminal record augur in favor of his release (*id.* at 12); and (6) he risks physical abuse while in federal custody (*See* letter to the Court from Mr. Kousouros, dated Mar. 16, 2009 ("Kousouros Letter II"), at 5).

### 1. *Substantiation*

Garcia first contends that the sealed complaint submitted to Judge Katz by AUSA Chung did not provide information sufficient to justify the issuance of a provisional warrant. (Kousouros Letter I at 5–6).

Article 9 enumerates the items that must be included in an application for provisional arrest under the Treaty, which are:

(a) a description of the person sought; (b) the location of the person sought, if known; (c) a brief statement of the facts of the case, including, if possible, the time and location of the offense; (d) a description of the laws violated; (e) a statement of the existence of a warrant of arrest or finding of guilt or judgment of conviction against the person sought; and (f) a statement that a request for extradition for the person sought will follow.

Treaty, art. 9, ¶ 2. Here, the Philippines' letter requesting Garcia's provisional arrest addressed each of these required items. (*See* Chung Letter at 5 & Ex. B). The Government's subsequent complaint seeking an arrest warrant under 18 U.S.C. § 3184 similarly fulfilled the Treaty requirements. (*See* Kousouros Letter I at Ex. A).

Garcia relies on *Caltagirone v. Grant,* 629 F.2d 739 (2d Cir.1980), as the basis for his Rule 4 evidentiary insufficiency claim. In *Caltagirone,* the Government sought the provisional arrest of a relator under an extradition treaty between the United States and Italy which stated that applications for provisional arrest must set forth "such further information, if any, as would be necessary to justify the issue of a warrant of arrest had the offense been committed ... in the territory of the requested Party." *Id.* at 744. Construing this language and that of the treaty article concerning formal extradition, the Second Circuit concluded that "in all cases where the United States is the 'requested Party[,]' a showing of probable cause is required." *Id.* at 745. The standard under both the article governing provisional arrest and that concerning formal extradition requests thus was the same as under Rule 4, which directs judges to issue an arrest warrant in a domestic case when the complaint establishes "probable cause to believe that an offense has been committed and that the defendant committed it." Rule 4(a).

Unlike the Italian treaty, however, the Treaty here contains no language requiring that a request for provisional arrest be sufficiently detailed to support the issuance of an arrest warrant in a case initiated in the requested state. See *Caltagirone,* 629 F.2d at 746 (noting that the provisional arrest language of United States extradition treaties falls into "two groups," only one of which requires that

the requesting party supply additional information supporting its request that the relator be arrested). Moreover, because the Treaty was signed after *Caltagirone* was decided, this difference in wording cannot be dismissed as a mere oversight. See *Duran v. Beaumont*, 534 F.3d 142, 146 (2d Cir.2008) (construction of a treaty "begin[s] with the text," but the court also may consider the "history of the treaty, the negotiations, and the practical construction adopted by the parties") (quoting *Eastern Airlines, Inc. v. Floyd*, 499 U.S. 530, 534–35, 111 S.Ct. 1489, 113 L.Ed.2d 569 (1991)). There consequently is no basis for Garcia's claim that the Philippines had to submit documentation sufficient to show probable cause before his provisional arrest could occur in the United States.

Turning to Garcia's constitutional claim, the Eighth Amendment provides that "[e]xcessive bail shall not be required." U.S. Const. amend. VIII. Although Garcia has not spelled out his Eighth Amendment argument in his papers, at least two district judges in this Circuit have suggested that "there may be an [E]ighth [A]mendment question when American citizens are held without bail in advance of a formal extradition request and without a showing of exigent circumstances." *United States v. Messina*, 566 F.Supp. 740, 745 (E.D.N.Y.1983) (Nickerson, J.); *accord Matter of Extradition of Hamilton–Byrne*, 831 F.Supp. 287, 294 n. 4 (S.D.N.Y.1993) (Fox, M., Mag. J.). In *Messina*, Judge Nickerson did not resolve this issue because he found that the arrestees were not bailworthy. *Messina*, 566 F.Supp. at 745. In *Hamilton–Byrne*, Judge Fox did not

address the issue, despite having raised it *sua sponte*, because the relators' motion failed to discuss it. *Hamilton–Byrne*, 831 F.Supp. at 294 n. 4.

If this were a federal criminal case, the Court likely would have set bail conditions during the initial presentment that Garcia could have met. Indeed, at the bail hearing and through subsequent letters from his counsel, Garcia has proffered ten potential cosigners of a personal recognizance bond, at least two of whom have six-figure incomes. (Tr. at 19–20; Kousouros Letter I at 13–15; Kousouros Letter II at 5). He also has offered to secure the bond by posting his uncle's home. In these circumstances, I likely would have required Garcia to procure multiple cosigners on a substantial bond secured by the posting of his uncle's house and perhaps some cash.[2] In addition, I probably would have imposed strict pretrial services supervision and home detention enforced by electronic monitoring.[3]

Because this is not a domestic case, the Eighth Amendment is not the only relevant authority. Rather, under the Supremacy Clause of the United States Constitution, the Court also must consider the Treaty. See U.S. Const. art. IV, cl. 2 ("This Constitution . . . and all Treaties made . . . under the Authority of the United States, shall be the supreme Law of the Land"); *Mora v. New York*, 524 F.3d 183, 192–93 (2d Cir.2008) (Supremacy Clause places treaty provisions "in the same category as other law of [C]ongress"). It follows that the Eighth Amendment's admonition concerning the

---

2. It bears mention that the Pretrial Services Officer recommended against bail, reasoning that Garcia has no family ties in New York and substantial ties to the Philippines. His report further notes, however, that Garcia's mother, brother, niece, and nephew reside in Michigan, and that he has another brother who resides in Nevada. Prior to his arrest,

Garcia also had maintained steady employment in the New York area.

3. This would have permitted Garcia to continue to work. See U.S. Courts—Home Confinement, Electronic Monitoring, http://www. uscourts.gov/fedprob/supervise/home. html# monitoring (last visited Apr. 28, 2009).

need to set reasonable bail in criminal cases cannot trump the Treaty. The Court therefore has the obligation to grant bail only when special circumstances exist—even where, as here, the relator is a United States citizen.

Although the "special circumstances" language in *Wright* is dictum, it constitutes the Supreme Court's only pronouncement on the topic of bail in extradition cases. *See* Joshua J. Fougere, Note, *Let's Try This Again: Reassessing the Right to Bail in Cases of International Extradition,* 42 Colum. J.L. & Soc. Probs. 177, 187 (2008) ("The notion of 'special circumstances,' solely a judicial creation, is still regulated by *Wright* and its progeny a century later."); see also *Parretti v. United States,* 122 F.3d 758, 784 n. 1 (9th Cir.1997), appeal dismissed on other grounds, 143 F.3d 508 (9th Cir.1998) (en banc) (noting that the Supreme Court has never ruled on whether the Eighth Amendment protects relators from a " 'special circumstances' only ban on bail") (citing *United States v. Salerno,* 481 U.S. 739, 754–55, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987)) (refusing to decide if the Eighth Amendment restricts Congress' ability to determine which criminal arrestees may be released on bail). The Supreme Court's special circumstances language therefore is·entitled to "considerable weight." See *United States v. Bell,* 524 F.2d 202, 206 (2d Cir.1975). The dicta in *Messina* and *Hamilton–Byrne* indicating that there *might* be an Eighth Amendment issue when the Government seeks the detention of a United States citizen in an extradition case, by comparison, obviously is entitled to far less weight.[4]

I therefore conclude that, notwithstanding Garcia's citizenship, he must show spe-

cial circumstances before the United States can be exposed to the political embarrassment that might result if he were released on bail and thereafter absconded. As noted above, Garcia contends that his case presents several additional such circumstances.

### 2. Complexity of Case and Length of Proceedings

Garcia argues that once the Republic serves a formal extradition request, it will be extremely time consuming for the Court to review the supporting documentation and make findings under Article 7 of the Treaty, which governs such requests. (Kousouros Letter I at 9). In an effort to emphasize the complexity of the charges against him, Garcia notes that his father's trial has been underway since 2006 and has involved nineteen hearings and hundreds of exhibits. (*Id.*). He further asserts, as part of his complexity argument, that Plunder may constitute a political offense for which extradition cannot be granted. (*Id.*).

There is some authority for the proposition that the length of the anticipated proceedings may be considered by a federal court in deciding whether to detain a relator. For example, in *United States v. Taitz,* 130 F.R.D. 442, 445 (S.D.Cal.1990), the relator questioned whether the crimes charged—over 400 counts of tax fraud and evasion—constituted extraditable offenses under the treaty. The court found that resolution of the issue would involve many rounds of proceedings that "would likely last for as long as two years," and that this constituted a special circumstance warranting bail. *Id.* at 446. Similarly, in *In re Extradition of Morales,* 906 F.Supp.

---

4. See also *In re Extradition of Russell,* 805 F.2d 1215, 1216–17 (5th Cir.1986) (noting that the district court cases Messina cites as the basis for suggesting that Wright might be

constitutionally infirm were both "reversed on appeal and the appellate court in each instance reiterated the 'special circumstances' test").

1368, 1375 (S.D.Cal.1995), the court concluded that the projected length of the proceedings constituted a special circumstance because the relator had been incarcerated for seven months and the court could not "see an end to the proceedings in the near future."

The Republic's case against Garcia may involve extensive documentation, but he has not established that this necessarily will result in an unreasonable delay in his extradition proceedings. Indeed, while the proceedings in the Philippines concerning General Garcia admittedly have been lengthy, the prosecutor's prior efforts there may enable the Republic to marshal the evidence against Garcia more succinctly when its formal request for extradition is made. (*See* Tr. at 9 (remarks of Garcia's counsel noting that General Garcia's trial is "supposed to end within 60 to 90 days," after evidence from his bail hearings is adopted)).

■ At this early stage, arguments about the complexity of the evidence underlying the formal charges against Garcia are both speculative and premature. Furthermore, Garcia has yet to be incarcerated for an extensive period of time, and a formal request for his extradition can reasonably be expected within sixty days of his arrest. Once the Philippines' request is received, the Court can reassess the likelihood that Garcia will face extended detention while it is being considered. As of now, the Court is unable to say that the complexity of the case against Garcia necessarily will delay his potential extradition to such an extent that it constitutes a special circumstance.

■ Furthermore, Garcia is not entitled to bail on the theory that the need to conduct an inquiry into whether the

charges against him are "political offenses" is a special circumstance.[5] In his papers, Garcia posits that, "in light of [General] Garcia's position and the manner in which the alleged crimes were committed, the [Plunder charge] may ... fall within the ambit of political crimes for which extradition is prohibited." (Kousouros Letter I at 9). It is difficult to see how the alleged receipt of $6 million in bribes could be considered a "political" crime. In any event, Garcia cites no authority, nor does there appear to be any Second Circuit case law suggesting that a person charged with an alleged political offense is entitled to special consideration by being granted bail pending an extradition hearing. There also is no evidence before the Court suggesting that the charged crimes are political, or that the determination of that issue will be unusually time-consuming. Garcia therefore is not entitled to bail on the theory that the Philippines extradition request seeks extradition for a political crime.

### 3. *Likelihood of Success on the Merits*

Garcia further contends that he is likely to prevail at trial and thus should be released on bail. (Kousouros Letter I at 10–11). Under the Plunder statute, "[a]ny public officer who, by himself or in connivance with members of his family ... amasses, accumulates or acquires ill-gotten wealth through a combination or series of overt criminal acts as described in Section 1(d)" is guilty of a crime. An Act Defining and Penalizing the Crime of Plunder, Rep. Act No. 7080, § 2 (1991) ("Rep.Act. No. 7080"). In addition, "[a]ny person who participated with the said public officer in the commission of an offense contributing to the crime of [P]lunder shall likewise be punished."[6] *Id.*

---

**5.** Article 3 of the Treaty provides that extradition "shall not be granted if the offense for

which extradition is requested is a political offense." Treaty, art. 3, ¶ 1.

**6.** In imposing punishment, a Philippines

Section 1(d) of the Plunder statute identifies the means by which "ill-gotten wealth" may be acquired, which include "misappropriation, conversion, misuse, or malversation of public funds" and "receiving, *directly or indirectly,* any commission, gift, share, percentage, [or] kickbacks . . . in connection with any government contract or project or by reason of the office or position of the public officer." *Id.* §§ 1(d)(1), (2) (emphasis added).

In the papers supporting his application for bail, Garcia notes that the only acts attributable to him are his receipt of funds which subsequently were used to purchase his apartment. (Kousouros Letter I at 10). He further states that there is no evidence that he was aware of the allegedly illegal source of the funds and that he is not a Philippines public official, did not participate in any acts attributed to his father, is not accused of any acts in the Philippines, and was not involved in any combination or series of overt criminal acts. (*Id.*).

■ A high probability of success on the merits has been recognized as a possible special circumstance. *See, e.g., United States v. Kin–Hong,* 83 F.3d 523, 524 (1st Cir.1996); *Salerno v. United States,* 878 F.2d 317, 317 (9th Cir.1989). Garcia, however, has not established such a likelihood here. For example, the fact that Garcia is not a public officer does not mean that he could not be found guilty of Plunder because Rep. Act No. 7080, like the federal aiding and abetting statute, 18 U.S.C. § 2, acknowledges that more than one person may be guilty of the crime. Indeed, the Philippines statute expressly states that it is a crime to obtain "ill gotten wealth" directly or indirectly. Rep. Act No. 7080 § 1(d)(2). The use of ill-gotten wealth to purchase an apartment in New York City

therefore would seem to make out a prima facie case of Plunder. Moreover, it remains to be seen what, if anything, the formal request will say about Garcia's knowledge of the source and allegedly illegal nature of the funds used to buy the apartment.

Additionally, even if the Court were to assume that Garcia's involvement entailed only his receipt of funds in this country, the Treaty does not limit extradition to offenses that occur solely within the Requesting State. Rather, the Treaty expressly provides that "[i]f the offense was committed outside of the territory of the Requesting State, extradition shall be granted . . . if the laws in the Requested State provide for punishment of an offense committed outside of its territory in similar circumstances." Treaty, art. 2, ¶ 4(a). Here, the information charges General Garcia and other members of his family, including Garcia, with the receipt of graft. As the Government correctly observes, the United States has at least one statute that criminalizes such conduct. (*See* Kousouros Letter I at Ex. A (Extradition Compl.) ¶ 9) (citing 18 U.S.C. § 201 (Bribery of Public Officials and Witnesses)). Furthermore, that statute proscribing the receipt of bribes by public officials is not restricted in its application to misconduct in the United States. *See United States v. Kennings,* 861 F.2d 381, 388 (3d Cir.1988) (extending application of Section 201 to bribery of witness before a Virgin Islands court). The fact that Garcia may not have taken any steps in furtherance of the crime of Plunder in the Philippines therefore is irrelevant.

### 4. *Diplomatic Necessity*

■ Garcia also argues that there is no diplomatic necessity for his detention in

court can consider the defendant's "degree of participation" and any "mitigating and extenuating circumstances." *Id.*

light of the three years during which the charges against him have been pending without formal extradition proceedings having been commenced. (Kousouros Letter I at 11). As part of this claim, he notes that bail is available in both the Philippines and the United States for the crime he is alleged to have committed. (*Id.*).

In *In re Chapman*, 459 F.Supp.2d 1024, 1027 (D.Haw.2006), upon which Garcia relies, the court found that a lack of diplomatic necessity for detention was a special circumstance warranting bail. There, the court determined that Mexico had not made prosecution of the extraditable offense a priority, instead waiting three years before bringing extradition proceedings against the respondents, who were living openly in the United States and were aware of the charges against them. *Id.* Although the Republic similarly has waited three years to institute extradition proceedings against Garcia, it cannot be said that it has failed to make prosecution of the offense a priority. Rather, as Garcia himself notes, the trial of General Garcia has been ongoing since 2006, during which time numerous hearings have been held. (Kousouros Letter I at 9). In light of those proceedings, it may merely have been the Philippines' desire to proceed in an orderly fashion that has delayed its request for Garcia's extradition until now.

Garcia also relies on *Taitz,* 130 F.R.D. at 446, another case in which the court found a lack of diplomatic necessity to be a special circumstance. In reaching that conclusion, the court observed, "[c]ertainly, there can be no diplomatic concern by South Africa if a United States court releases on bail a person who is facing extradition to South Africa where bail is available in South Africa for persons facing extradition to the United States." *Id.* at 447. Indeed, some courts have recognized the availability of bail in the requesting

country as a special circumstance. *See, e.g., Matter of Extradition of Nacif–Borge,* 829 F.Supp. 1210, 1221 (D.Nev.1993). If that truly constituted a special circumstance, however, the exception soon would swallow the rule, as more recent cases appear to recognize. *See In re Extradition of Siegmund,* 887 F.Supp. 1383, 1386 (D.Nev.1995) (rejecting the holding in *Nacif–Borge,* citing *In re Extradition of Rouvier,* 839 F.Supp. 537 (N.D.Ill.1993)); *see also In re Kim,* No. CV 04–3886, 2004 U.S. Dist. LEXIS 12244, at *6 (C.D.Cal.2004) (concluding that bail is available in most cases and therefore is not a special circumstance); *In re Extradition of Sacirbegovic,* 280 F.Supp.2d 81, 86–87 (S.D.N.Y.2003) (mere possibility of bail in requesting country not a special circumstance).

Finally, the fact that the Philippines has yet to commence formal extradition proceedings also does not suggest a lack of diplomatic necessity. Indeed, the provisional arrest procedure found in Article 9 of the Treaty exists precisely so that a relator may be arrested before a formal extradition request is made. At this moment, there is no reason to believe that the Philippines will not transmit such a request shortly.

Garcia consequently has not shown a lack of diplomatic necessity for his continued detention.

### 5. *Personal History*

 Garcia also asserts that he is neither a flight risk nor a danger to the community and would abide by conditions of release. (Kousouros Letter I at 15). Garcia notes that he is a citizen of the United States, has lived in his New York apartment since 2003, and has not been arrested for any other crime. (*Id.* at 12). He further observes that he has not attempted to flee from the United States or hide from the Philippines authorities de-

spite having known of the outstanding charges for several years. (*Id.*). As noted earlier, to demonstrate that reasonable bail conditions could be set, Garcia has proposed ten family members and friends as potential sureties, and also has offered as collateral a security interest in his uncle's home. (*Id.* at 13–15; Kousouros Letter II at 5). He indicates that he further is amenable to electronic monitoring. (Kousouros Letter II at 5).

The Government counters that the Garcia family has considerable wealth, little, if any, of which it has offered to post, and notes that Garcia recently traveled to Europe, Canada, and Hong Kong. (*See* Chung Letter at 6). While these are appropriate factors to consider in setting bail, I frankly consider the risk that Garcia would flee if enlarged on bail to be slight. Garcia does not have any criminal history, appears disinclined to leave the life he has made for himself in the United States, and has proffered ten sureties and collateral for a bond. Nonetheless, in the extradition context, the fact that a relator may not flee is not a basis for the granting of bail. *See Leitner,* 784 F.2d at 161 (affirming denial of bail despite the proffer of a bond because "[e]ven a low risk of flight" is not a circumstance sufficiently "unique" to constitute a special circumstance); *Borodin v. Ashcroft,* 136 F.Supp.2d 125, 130 (E.D.N.Y. 2001) ("Absence of risk of flight is not a legally cognizable 'special circumstance' justifying release from bail.") (citing cases); *Ernst,* 1998 WL 51130, at *13 (low risk of flight is not a special circumstance); *United States v. Tang Yee–Chun,* 657 F.Supp. 1270, 1272 (S.D.N.Y.1987) (same).

■■■■■ In addition, although a citizen generally possesses greater constitutional rights than an alien, *see, e.g., Demore v. Hyung Joon Kim,* 538 U.S. 510, 521, 123 S.Ct. 1708, 155 L.Ed.2d 724 (2003), Garcia is not entitled to special consideration based on his status as a United States citizen. Citizens and non-citizens alike must demonstrate special circumstances to overcome the presumption against bail. *See, e.g., Leitner,* 784 F.2d at 160–61; *Martin v. Warden, Atlanta Pen.,* 993 F.2d 824, 825, 828 (11th Cir.1993); *Matter of Extradition of Russell,* 805 F.2d 1215, 1216–17 (5th Cir.1986); *Ernst,* 1998 WL 51130, at *1,*13. Moreover, the Treaty does not distinguish between citizens and non-citizens, specifically stating in Article 6 that "[e]xtradition shall not be refused on the ground that the person sought is a citizen of the Requested State." Treaty, art. 6.

### 6. *Prison Conditions*

■■■■ Garcia is young and slightly built. Perhaps for these reasons, Garcia asked to be placed in segregation when he was taken into custody. (*See* Kousouros Letter II at 5). He initially was held in the Special Housing Unit ("SHU") at the MDC, where he was subjected to "24 hour lockdown, . . . ha[d] no access to a telephone . . . and [was un]able to arrange for family visits." (*Id.*). In a recent letter, Garcia complained that he nevertheless was the victim of unwanted sexual advances almost immediately after a new cellmate was placed in his SHU cell. (*See* letter to the Court from Mr. Kousouros, dated Mar. 25, 2009, at 1). Although Garcia contends that the Bureau of Prisons did not respond to this problem when it first was reported, (*id.*), the Government indicates that Garcia was, in fact, moved to a different SHU cell and has now been placed in general population at the MDC. (*See* letter to the Court from AUSA Chung, dated Mar. 26, 2009, at 1).

While the original conditions of Garcias's confinement may have been less than ideal, there is no indication that he suffered any physical injury or that the problems that he encountered while in the SHU are continuing in general population. In any

event, even if that could be shown, unpleasant prison conditions do not entitle Garcia to be granted bail. *See Borodin*, 136 F.Supp.2d at 131 (the differences between prison and house arrest, while "undoubtedly large," are "not enough to constitute 'special circumstances' "); *In re Klein*, 46 F.2d 85 (S.D.N.Y.1930) (rejecting extraditee's application for bail based on the "discomfort of the jail in which incarceration must be endured").

### C. *Urgency*

 Finally, Garcia contends that he should be released because there was no urgency that justified his provisional arrest. (Kousouros Letter I at 6–9). Pointing to a report by the Senate Committee on Foreign Relations discussing Article 9, Garcia argues that a risk of flight is the only condition of "urgency" that warrants resort to the provisional arrest procedures. (*Id.* at 6–7). That report notes with respect to Article 9 that "[e]xperience has shown that the ability to use direct channels in emergency situations can be crucial when a fugitive is poised to flee a jurisdiction." (*Id.* at Ex. C (S. Comm. on Foreign Relations, 104th Cong., Report on Extradition Treaty with the Philippines, § VII, art. 9, available at http://www.lawp hil.net/international/treaties/extrad.html)). In Garcia's view, because he is neither a fugitive from justice nor someone who presents a risk of flight, Article 9 cannot properly be invoked. (*Id.* at 7). Garcia alleges that the charges against him were filed over three years ago and that nothing "has changed so as to convert a stagnant situation into one of 'urgency.' " (*Id.* at 8).

While the Senate Committee report indicates that a risk that a relator may flee can give rise to "urgency," it is by no means clear that this example was meant to exclude other potential reasons for seeking a relator's provisional arrest. Before reaching that question, however, I note that the Court must first determine whether the urgency language in Article 9 is justiciable. The Government contends that it is not, pointing primarily to *Caltagirone* and *Hamilton–Byrne*. (*See* Chung Letter at 5–6; letter to the Court from AUSA Chung, dated Mar. 13, 2009, at 1–3). In *Caltagirone*, however, the Second Circuit expressed "reservations" regarding the district judge's reluctance to review Italy's determination that the request for the relator's arrest involved urgency. *Caltagirone*, 629 F.2d at 744 n. 10.

Similarly, in *Hamilton–Byrne*, Judge Broderick noted that there is "some support for [the] necessity of a finding of urgency in extradition." 831 F.Supp. at 290 (citing *Matter of Extradition of Pazienza*, 619 F.Supp. 611, 612 (S.D.N.Y. 1985)).[7] In that case, Judge Broderick was presented with an appeal from a decision by Magistrate Judge Mark Fox denying the relators' request to be released on bail. Although Judge Broderick suggested that urgency might be justiciable, Judge Fox had concluded to the contrary that, "[i]n light of the [extradition treaty with Australia] and relevant authorities . . . the issue of urgency [for a provisional arrest] is *not* subject to judicial review." *Id.* at 293 (emphasis added). Judge Fox further found that even if the issue could be considered, the Government's application for provisional arrest satisfied the urgency requirement of the treaty. *Id.*

Several other courts also have found it unnecessary to determine whether the urgency requirement in a bilateral extradition treaty is justiciable. For example, in *Messina*, 566 F.Supp. at 744–45, Judge Nickerson questioned the Government's contention that the issue of urgency was

---

7. Curiously, the case that Judge Broderick cited as authority for the reviewability of an urgency claim says no such thing. *See Pazienza*, 619 F.Supp. at 612.

non-justiciable, noting, among other considerations, that courts often scrutinize the sufficiency of provisional arrest applications in other ways, and that if urgency were not amenable to judicial review, "provisional arrest may become the rule rather than the exception." Ultimately, Judge Nickerson found it unnecessary to decide whether "urgency" was justiciable, denying the bail request on other grounds. *Id.* at 745. Similarly in *Leitner*, the Second Circuit did not expressly decide whether urgency was justiciable because it found that the violent acts of terrorism alleged, together with the risk of flight, warranted the denial of bail. 784 F.2d at 160–61.

While not reaching the issue of justiciability, the *Leitner* court observed that the word " 'urgency' is not merely temporal in nature. Rather, the term involves other considerations including the importance of the matter to the country seeking extradition and foreign policy concerns of the United States." *Id.* at 161. In this case, urgency exists in both a temporal sense and in relation to the importance of the matter to the Philippines. Indeed, it is undisputed that the evidence-gathering phase of the case against General Garcia is coming to a close, and that the Philippines now appears ready to move forward with its case against Garcia and his relatives. (*See* Chung Letter Ex. B at 3). It is reasonable to assume that the Philippines will want to try all of the remaining defendants together rather than proceeding individually against Garcia. This alone gives rise to some time sensitivity.

In addition, by processing the Philippines' request, the United States evidently has expressed its agreement that there has been a showing of urgency sufficient to justify the issuance of a provisional arrest warrant. This is a foreign policy decision entitled to deference. *Leitner*, 784 F.2d at 161.

Accordingly, even if this Court properly can address the issue of urgency, the complaint in this case makes the requisite showing. This determination can, of course, be reconsidered if the Philippines fails to file a formal extradition request within sixty days of Garcia's arrest.

### III. *Conclusion*

Garcia has demonstrated neither special circumstances nor a lack of urgency. For these reasons, his application for bail is denied.