### In the Matter of the EXTRADITION OF Dimitrios SKAFTOUROS.

### 08 Crim. Misc. 01 (THK).

United States District Court, S.D. New York.

July 31, 2009.

## MEMORANDUM OPINION
## AND ORDER

THEODORE H. KATZ, United States Magistrate Judge.

In this proceeding, the United States (the "Government") seeks the extradition of Dimitrios Skaftouros ("Skaftouros" or "the Relator") to Greece to face the charge of being an accessory to homicide, pursuant to a request from the Greek government under the Extradition Treaty Between the United States of America and Greece, United States–Greece, May 6, 1931, 47 Stat. 2185 (the "Treaty"). The primary evidence presented against Skaftouros is a judicial report, which contains a narrative summary of his alleged crimes, and concludes by indicting him and his co-defendants. Although the narrative cites only unsworn depositions and makes use of conjecture, it is highly detailed, and corroborated by recent statements from the Relator and one of his purported accomplices. Therefore, the Government has carried its burden to show that there is probable cause to support the charge against Skaftouros. For the reasons fully explained below, the Government's request for a certificate of extraditability for Skaftouros is GRANTED.

## BACKGROUND

### I. The Allegations Against Skaftouros

The following summary is drawn from a certified translation of a report issued by the Council of Magistrates in Athens, dated April 3, 1991. (*See* Translation of Council of Magistrates Report, certified on June 12, 2008 ("Report").)

In early 1990, Constantinos Spinaris, Dimitrios Agapitos, and Vasilios Vasiliou hatched a plot to kidnap Vasiliou's cousin, Ioannis Tsatsanis, known in the Athens neighborhood where they all resided as Marselino ("Marselino" or "the victim"). Spinaris and Agapitos believed Marselino's father, Georgios Tsatsanis ("Tsatsanis"), was wealthy, and thought he would pay a large ransom. Since Spinaris, Agapitos, and Vasiliou were each acquainted with Marselino, they enlisted Skaftouros to help carry out the abduction. Skaftouros, in turn, recruited two men who worked at his father's tavern, Stamatios Grypeos and Ioannis Lazarou. (*See* Report at 16–17.)

To conceal their involvement in the plot, Spinaris and Agapitos staged a hijacking in which they would appear to be attacked

along with Marselino. Spinaris and Agapitos first stole a tape recorder from Marselino's car, or arranged to have it stolen. At their suggestion, he agreed to accompany them on a feigned search for the thieves on March 18, 1990. The three drove in Agapitos's van to a location on the outskirts of Athens. Skaftouros, Grypeos, and Lazarou were waiting there, armed with guns and wearing hoods over their faces. While pretending to attack Spinaris and Agapitos, the assailants handcuffed the victim and drew a hood over his head. (*See id.* at 17–18.) They drove him away in a car belonging to Ioannis Avramidis, who was Skaftouros's cousin's husband and worked in a tavern owned by Skaftouros's father. (*See id.* at 25.) Meanwhile, Agapitos and Spinaris informed Vasiliou that the victim had been taken. Vasiliou agreed to monitor the activities of Marselino's family. (*See id.* at 18.)

At around 4:00 a.m. on the morning of March 19, Skaftouros, Grypeos, and Lazarou arrived in the Athens suburb of Haidari with Marselino. They took him to the home of their acquaintance, Ioannis Petrakis, where Petrakis and Theofania Mesmerli were asleep. Skaftouros then departed, while Grypeos and Lazarou led the hooded, handcuffed Marselino at gunpoint to a storeroom with no windows. (*See id.* at 19–20.) Grypeos and Lazarou stayed in the house for the remainder of the night, along with Marselino, but Petrakis and Mesmerli left for a hotel. Skaftouros, Petrakis, and Mesmerli returned during the day on March 19, and shared a meal with Grypeos, Lazarou, and Marselino. Afterwards, Grypeos forced Marselino to make a tape recording to play for his father.[1] (*See id.* at 20–21.) In the presence of ev-

eryone, Marselino pleaded, "Dad, give all the money they ask or you will not see me again." (*Id.* at 22.)

The kidnappers did not use the recording immediately, but continued to hold Marselino for several days. Grypeos and Lazarou remained with him at Petrakis's residence. Skaftouros brought them food. Avramidis remembers driving to Haidari with Skaftouros one night in March of 1990, and waiting in his car while Skaftouros ran in to a friend's basement-level house for five minutes. When he returned, Avramidis asked, "what is wrong," to which Skaftouros allegedly replied, "let it go, I do not want you to get in, you've got children." (*Id.* at 26.) Spinaris and Agapitos also visited Petrakis's house during this period. Finally, on March 21, Spinaris met Grypeos at the house, and the two men took the recording to a nearby phone booth. (*See id.* at 23.) Affecting a foreign accent, Grypeos placed a call to Tsatsanis, demanded 150,000,000 drachmas in ransom for the return of Marselino, and played the tape. (*See id.* at 11, 23.) When Tsatsanis protested that he could not pay such an amount, and offered his and his son's cars instead, Grypeos said no, insisted on receiving money, and hung up. (*See id.* at 11.)

Although the Report's account of the next few hours on March 21 is confusing, it appears that the conspirators began to worry that the police would uncover their plot. Apparently, Tsatsanis decided to pay a substantial sum for the return of his son. Vasiliou learned that the victim's father had gathered 70,000,000 drachmas, and informed Spinaris and Agapitos. Spinaris, who seems to have gained Tsatsan-

---

1. The Report indicates that Vasiliou provided the tape recorder to Agapitos and Spinaris when he met them after the mock attack, but does not indicate how it appeared in Petrakis's house the next day. However, the reader

might infer that, after leaving Petrakis's house for the night, either Skaftouros, Petrakis, or Mesmerli met with Agapitos and Spinaris, and took possession of the recorder at that point.

is's trust by pretending to assist in the search for Marselino, told Agapitos that Tsatsanis planned to drop the ransom money at a nearby elementary school.[2] However, Agapitos became scared of getting caught, and refused to retrieve the payment. (*See id.* at 24.) Vasiliou, who did not know where Marselino was being held, told Spinaris to kill Marselino so that he could not reveal their identities. (*See id.*)

The urge to silence the hostage prevailed. On the evening of March 21, Skaftouros, Agapitos, Spinaris, and Lazarou met at Skaftouros's father's tavern and resolved to kill Marselino. (*See id.* at 24–25.) They guessed that he had recognized the voices of Spinaris and Agapitos during their visits to Petrakis's house. The group met Avramidis, and took his car and a van to pick up Grypeos and Marselino in Haidari. After placing Marselino again in a hood and handcuffs, Skaftouros, Agapitos, Spinaris, Lazarou, Avramidis, and Grypeos drove him out of Athens. (*See id.* at 27.) Shortly after midnight on March 22, the two vehicles came to a crossroads outside the village of Skourta. From that point, Skaftouros, Spinaris, Agapitos, Grypeos, and the victim continued in the van, while Avramidis and Lazarou stayed behind in Lazarou's car.

The van proceeded about eight kilometers, through an uninhabited area of the countryside, to some land belonging to a relative of Skaftouros. On this property sat a sheepfold where Skaftouros's father used to slaughter lambs for meat to sell in his tavern.[3] (*See id.* at 12–13, 28, 30.) Skaftouros stayed in the van, while Spinaris, Agapitos, and Grypeos led Marselino to the building. (*See id.* at 28.) The three men brought their captive to a freshly dug pit, which the report alleges was prepared earlier by Spinaris and Agapitos.[4] They made Marselino sit down in it, still wearing the hood and handcuffs. (*See id.* at 28–29.) Spinaris, Agapitos and Grypeos then conversed briefly outside the sheepfold. Spinaris and Agapitos handed Grypeos a bag with a revolver, allegedly belonging to Skaftouros, and said, "you will kill him." (*Id.* at 30.)

Grypeos walked back to the pit and shot Marselino twice, once in the chest and once in the neck. He then returned to the van where Skaftouros was waiting and announced that he had killed Marselino. Spinaris and Agapitos buried the victim's body. (*See id.* at 30.) They then rejoined their accomplices and drove back to Athens. (*See id.* at 30.) Avramidis claims that, the next day, Skaftouros revealed to him that "they had transported to Skourta

---

2. The Report contains some discrepancies about what the kidnappers told one another. Although Vasiliou told Spinaris and Agapitos that Tsatsanis raised 70,000,000 drachmas, Spinaris told Agapitos that Tsatsanis put up "as much as they had asked for," which would suggest the full demand of 150,000,000 drachmas. (*Id.*) The Report does not clarify exactly who knew Tsatsanis would pay the ransom, how much money he obtained, how he believed he was communicating with the kidnappers, or how and when he would make the drop. However, these details are not critical to the Court's determination of whether there is reason to believe Skaftouros participated in the conspiracy.

3. Judging by the Report, Skaftouros and the owner of the sheepfold, Christos Agathis, would appear to be cousins. (*See* Report at 28.) Athanassios Agathis is the uncle of Christos Agathis (*see id.* at 12–13), and the Report states that "Skaftouros is the son of Athanassios Agathis' [sic] sister" (*id.* at 28).

4. If this is in fact the case, it would appear that Spinaris and Agapitos had decided to kill Marselino before meeting their cohorts at Skaftouros's father's tavern on the night of March 21. Since the sheepfold was located many kilometers away from Athens, Spinaris and Agapitos would have had to make the trip either before that day or much earlier in the day.

a person whom they have murdered." (*Id.* at 31.)

Although Grypeos made another call to Tsatsanis to demand a ransom several days later, the effort was unsuccessful. Tsatsanis recorded the call and went to the police. (*See id.* at 12, 32–33.) The investigation stagnated until Marselino's body was discovered in June 1990, followed shortly by Petrakis surrendering to the authorities and making a statement. (*See id.* at 13–14.)

## II. Procedural History

Skaftouros fled Greece for Italy in May 1990. (*See* Application for Extradition, dated Sept. 29, 2008 ("Gov't App.") Ex. B.) On June 22, the Investigating Magistrate for the Magistrate's Court of Athens issued a warrant for Skaftouros's arrest. (*See* English translation of Warrant issued Jun. 22, 1990 ("Warrant Transl."), attached to certificate of authenticity for documentary evidence signed by Ambassador Daniel V. Speckhard, dated Sept. 11, 2008 ("Speckhard Cert.").) After traveling from Italy to Canada, in 1992 Skaftouros illegally entered the United States, where he has since remained.

■ On May 29, 2008, federal law enforcement agents who had been tracking Skaftouros detained him for questioning in New York City. (*See* Gov't App. Ex. B.) He lied about his identity and presented false identification. Suspecting that he was wanted in Greece in connection with Marselino's abduction and murder, the agents arrested him and charged him with making false statements. (*See id.*) Several days later, the Greek government transmitted a request to arrest Skaftouros pending extradition to Greece to face the charge of being an accessory to intentional homicide.[5] On June 11, the Government dismissed the indictment for making false statements, then immediately re-arrested Skaftouros and presented him on a complaint seeking extradition. (*See* Letter from Edward Y. Kim, dated Mar. 10, 2009 ("Kim Mar. 10 Ltr.") at 1.)

To support the charge that Skaftouros was an accessory to Marselino's murder, Greek authorities have provided (i) the Magistrates Report, which sets forth the narrative summarized above, and concludes by issuing indictments against the conspirators, including Skaftouros, and (ii) a certified translation of the June 22, 1990 arrest warrant. Ambassador Daniel Speckhard, the principal diplomatic officer of the United States in Greece, has authenticated both documents. (*See* Speckhard Cert.; Declaration of Clifton M. Johnson, dated Sept. 10, 2008 ("Johnson Decl.") (attesting that Ambassador Speck-

---

**5.** The warrant for Skaftouros's arrest also lists the charge of kidnapping a minor for ransom. (*See* Warrant Transl.) The Report indicts Skaftouros for this crime as well. (*See* Report at 45.) "Kidnapping of minors or adults ... to exact money from them, their families or any other person," Treaty Art. II(17) is an extraditable offense under the Treaty, as is aiding in such a crime, *see id.* Art. II(27). However, the Government presents Greece's requisition as premised only on the charge of being an accessory to homicide, and Skaftouros's defense to extradition similarly addresses solely this charge. (*See* Gov't App. at 1; Memorandum of Law in Support of Skaftouros's Motion to Dismiss Extradition Complaint, dated May 29, 2009 ("Relator's Mem."), at 3.) Since the Court concludes below that the Government has carried its burden with respect to the indictment for being an accessory to murder, there is no need to perform a separate analysis of the kidnapping indictment. In any event, the alleged kidnapping and murder form part of the same sequence of events. Moreover, on its own, Skaftouros's statement to investigators in the United States that he was aware of the plot to kidnap Marselino, and secured a vehicle to use in the abduction, would suffice to establish probable cause to extradite him to stand trial in Greece for the kidnapping charge. *See* discussion *infra*.

hard authenticated the Report in accordance with § 3190 on June 12, 2008).)

## DISCUSSION

### I. Legal Standard for Certifying a Fugitive as Extraditable

■■■ Under the federal extradition statute, a court may issue a certificate of extraditability for a fugitive if it "deems the evidence sufficient to sustain the charge under the provisions of the proper treaty or convention." 18 U.S.C. § 3184 (2009). "The function of the committing magistrate is to determine whether there is competent evidence to justify holding the accused to await trial, and not to determine whether the evidence is sufficient to justify a conviction." *Collins v. Loisel,* 259 U.S. 309, 316, 42 S.Ct. 469, 472, 66 L.Ed. 956 (1922). The determination of the relator's guilt or innocence should be made by the foreign court at trial. *See Melia v. United States,* 667 F.2d 300, 302 (2d Cir. 1981) ("An extradition hearing is not the occasion for an adjudication of guilt or innocence."); *Jhirad v. Ferrandina,* 536 F.2d 478, 484–485 (2d Cir.1976) (explaining that an extradition hearing must not become a "dress rehearsal trial"); *accord In re Extradition of Sandhu,* 886 F.Supp. 318, 325 (S.D.N.Y.1993). Thus, the extradition determination pursuant to § 3184 is "essentially a preliminary examination to determine whether a case is made out which will justify the holding of the accused and his surrender to the demanding nation." *Lo Duca v. United States,* 93 F.3d 1100, 1104 (2d Cir.1996) (quotation marks and citation omitted); *accord Simmons v. Braun,* 627 F.2d 635, 636 (2d Cir.1980).

■■■ Accordingly, "[t]he judicial officer's inquiry is confined to the following: whether a valid treaty exists; whether the crime charged is covered by the relevant treaty; and whether the evidence marshaled in support of the complaint for extradition is sufficient under the applicable standard of proof." *Cheung v. United States,* 213 F.3d 82, 88 (2d Cir.2000); *accord In re Extradition of Berri,* No. 07 M. 1205(VVP), 2008 WL 4239170, at *1 (E.D.N.Y. Sept. 11, 2008).

Skaftouros does not dispute the validity of the Treaty, or that it covers the crime charged against him. He only challenges the adequacy of Greece's request for extradition. Thus, the task for the Court is to "analyze if there is probable cause to believe that the individual committed acts alleged in the extradition request." *Spatola v. United States,* 925 F.2d 615, 618 (2d Cir.1991); *accord Beukes v. Pizzi,* 888 F.Supp. 465, 467 (E.D.N.Y.1995); *see Caltagirone v. Grant,* 629 F.2d 739, 745–46 (2d Cir.1980) (explaining that § 3184 requires a "presentation of the 'evidence' establishing probable cause").

■■■ To establish probable cause, "[t]he evidence presented need only 'support a reasonable belief that [the fugitive] was guilty of the crimes charged.'" *Austin v. Healey,* 5 F.3d 598, 605 (2d Cir.1993) (internal alterations omitted) (quoting *Ahmad v. Wigen,* 910 F.2d 1063, 1066 (2d Cir.1990)). Probable cause in extradition proceedings is determined by the same standards used in federal preliminary hearings. *See Sindona v. Grant,* 619 F.2d 167, 175 (2d Cir.1980). In making this determination, courts apply a "totality of the circumstances analysis" and use a "flexible, common-sense standard." *Illinois v. Gates,* 462 U.S. 213, 238–240, 103 S.Ct. 2317, 2332–2334, 76 L.Ed.2d 527 (1983). A court may find probable cause on the basis of "knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *United States v. Howard,* 489 F.3d 484, 491 (2d Cir.2007). Neither the Federal Rules of

Evidence nor the Federal Rules of Criminal Procedure apply to extradition proceedings. *See Simmons,* 627 F.2d at 636. "Hearsay and other excludable evidence, therefore, may be admissible." *Melia,* 667 F.2d at 302; *see In re Ryan,* 360 F.Supp. 270, 273 (E.D.N.Y.1973) ("A determination of probable cause in an extradition proceeding may rest entirely upon hearsay."), *aff'd,* 478 F.2d 1397 (2d Cir.1973); 18 U.S.C. § 3190 (authorizing United States ambassadors to provide certificates of authenticity for "[d]epositions, warrants, or other papers or copies thereof" submitted by the requesting country, thereby rendering the documents admissible). Courts may even rely on "unsworn statements of absent witnesses." *Collins,* 259 U.S. at 317, 42 S.Ct. 469; *accord Simmons,* 627 F.2d at 636. In this respect, a court must "closely examine the requesting country's submissions to ensure that any hearsay bears sufficient indicia of reliability to establish probable cause." *In re Extradition of Ben–Dak,* No. 06 Mag. 1540(GWG), 2008 WL 1307816, at *4 (S.D.N.Y. Apr. 11, 2008) (quotation marks and citation omitted).

 A fugitive "may be permitted to offer explanatory testimony, but may not offer proof which contradicts that of the demanding country." *Messina v. United States,* 728 F.2d 77, 80 (2d Cir. 1984). "Thus, in challenging an extradition request, the respondent may not present evidence to impeach the witnesses' statements, to establish an alibi, or to raise a defense of insanity." *In re Szepietowski,* No. M. 08–971(CLP), 2009 WL 187568, at *4 (E.D.N.Y. Jan. 23, 2009) (internal citations omitted). It follows that fugitives are not entitled to the discovery they would enjoy in relation to a criminal trial. *See Messina,* 728 F.2d at 80 (rejecting a claim that extradition proceedings were defective because the district court did not authorize the fugitive to take discovery, reasoning that trial protections did not

apply); *see also Sandhu,* 886 F.Supp. at 325 ("[I]t is within the court's discretion to permit discovery in connection with an extradition proceeding...."). In addition, the "wrongful exclusion of specific pieces of evidence, however important, does not render the detention illegal." *Collins,* 259 U.S. at 316, 42 S.Ct. at 472.

## II. The Asserted Defects Related to Skaftouros's Arrest Warrant Cannot Prevent Extradition

 The relevant part of the Treaty for purposes of this proceeding is Article XI, which provides as follows:

> The arrest of a fugitive shall be brought about in accordance with the laws of the respective countries, and if, after an examination, it shall be decided, according to the law and the evidence, that extradition is due pursuant to this treaty, the fugitive shall be surrendered in conformity to the forms of law prescribed in such cases.... [Where] the fugitive is merely charged with crime, a duly authenticated copy of the warrant of arrest in the country where the crime was committed, and of the depositions upon which such warrant may have been issued, shall be produced, with such other evidence or proof as may be deemed competent in the case."

Treaty Art. XI.

As a preliminary matter, Skaftouros attacks the drafting, signing, and service of the June 22, 1990 warrant for his arrest. He contends that the warrant fails to comply with Article 276.3 of the Greek Criminal Procedure Code ("CPC") because it does not bear the signature of the clerk. (*See* Warrant Transl.) While the Investigating Magistrate did sign the warrant, the document notes that the clerk "[f]aces an impediment due to the late hour." (*Id.*) Skaftouros also faults the warrant for omitting "the most precise possible de-

scription of the face of the person under arrest," in purported violation of CPC Article 276.3. (*See* Relator's Mem. at 4.) Lastly, he argues that "the government's extradition papers fail to allege, let alone demonstrate, that the Greek authorities ever attempted to serve Skaftouros with the arrest warrant, in apparent contravention of CPC Articles 115 and 156." (*Id.* at 5.) This, he claims, amounted to a "denial of due process to Skaftouros in Greece." (*Id.*)

The Government first argues that any defects in the warrant are irrelevant, because Congress has waived the requirement in Article XI that the government demanding extradition provide "a duly authenticated copy of the warrant of arrest." Treaty Art. XI. In *Grin v. Shine,* 187 U.S. 181, 23 S.Ct. 98, 47 L.Ed. 130 (1902), the Supreme Court found that the relevant extradition statute at the time had waived an obligation to produce certain documents imposed by the extradition treaty between the United States and Russia. *See id.* at 191, 23 S.Ct. at 102. In the current statute, 18 U.S.C. § 3184 instructs that, upon finding "evidence sufficient to sustain the charge," an extradition court "shall certify the same." 18 U.S.C. § 3184. As one court recently observed, § 3184 does not "require an authenticated copy of a warrant of arrest" to certify the sufficiency of evidence against a relator. *In re Extradition of Harusha,* No. 07–x–51072, 2008 WL 1701428, at *7–8 (E.D.Mich. Apr. 9, 2008), *stay denied,* 2008 WL 1932016 (E.D.Mich. May 1, 2008). Citing *Grin,* the court in *Harusha* therefore concluded that its "duty [wa]s not conditioned on the Gov-

ernment's submission" of such a document. *See id.* at *7–8. Here, the Government urges the Court to follow the interpretation of § 3184 adopted in *Harusha.*

The Court sees no reason to go so far. It need not assume that § 3184 waters down the Treaty's protections for Greek fugitives held in the United States. Skaftouros does not dispute that the Government has submitted the "authenticated" warrant called for in Article XI. As the extradition statute further explains, "the certificate of the principal diplomatic or consular officer of the United States resident in [the demanding country] shall be proof that [a warrant is] authenticated in the manner required," such that it "shall be received and admitted as evidence." 18 U.S.C. § 3190. Ambassador Speckhard's certification of September 11, 2008 has thus "authenticated" the warrant for purposes of the Treaty.[6] Because Skaftouros does not argue otherwise, there is no need to read the warrant provision out of Article XI.

■■■ Skaftouros's challenge to the adequacy of the warrant thus rests not on a failure to follow the Treaty, but on noncompliance with Greek law. However, as the Government next argues, "[i]t is not the business of our courts to assume the responsibility for supervising the integrity of the judicial system of another sovereign nation." *Jhirad,* 536 F.2d at 484–85; *see Melia,* 667 F.2d at 303 ("We are not expected to become experts in the laws of foreign nations.") (citation and internal alterations omitted). Thus, "review[ing] compliance with foreign criminal proce-

---

**6.** Of course, § 3190 is not part of the Treaty itself. A party might conceivably argue that authentication under the Treaty requires more than certification by the receiving country's ambassador. Nevertheless, § 3190 does give full effect to the Treaty's authentication requirement, unlike the Government's proposed interpretation of § 3184. Accepting

the procedures in § 3190 as sufficient, the Court can follow the pronouncement in *Grin* that "Congress has a perfect right to provide for the extradition of criminals in its own way, with or without a treaty to that effect," without engineering a conflict between the extradition statute and the Treaty. *Grin,* 187 U.S. at 191, 23 S.Ct. at 102.

dure" falls outside the role of an extradition court. *In re Assarsson*, 635 F.2d 1237, 1244 (7th Cir.1980); *see Grin*, 187 U.S. at 190–91, 23 S.Ct. 98 ("[I]t can hardly be expected of us that we should become conversant ... with the forms of warrants of arrest used [in Russia] for the apprehension of criminals."). Sound policies justify this conclusion.

[T]he narrow scope of review is based on respect for the sovereignty of other nations. While our courts should guarantee that all persons on our soil receive due process under our laws, that power does not extend to overseeing the criminal justice system of other countries. This respect is embodied in the procedural framework of international extradition, which "gives to the demanding country advantages most uncommon to ordinary civil and criminal litigation." *First National City Bank of New York v. Aristeguieta*, 287 F.2d 219 (2d Cir. 1960).... We often have difficulty discerning the laws of neighboring States, which operate under the same legal system as we do; the chance of error is much greater when we try to construe the law of a country whose legal system is much different from our own. The possibility of error warns us to be even more cautious of expanding judicial power over extradition matters.

*Assarsson*, 635 F.2d at 1244.

Therefore, as a rule, courts in the United States do not "become enmeshed in the technicalities of foreign criminal processes." *Borodin v. Ashcroft*, 136 F.Supp.2d 125, 129–30 (E.D.N.Y.2001); *see United States ex rel. Petrushansky v. Marasco*, 325 F.2d 562, 564–65 (2d Cir.1963) ("[A] Mexican internal law [forbidding detention for longer than three days without a formal complaint] is of course primarily for the courts of that country to interpret; our duty would seem limited to ensuring that the applicable provisions of the treaty and the governing American statutes are com-

plied with."); *Ex Parte Davis*, 54 F.2d 723, 724 (9th Cir.1931) ("The question of the sufficiency of the charge in Mexico was not before the commissioner for his consideration except as it might tend to show whether or not the petitioner had committed an extraditable crime"); *In re Extradition of Sacirbegovic*, 03 Cr. Misc. 01 Pg. 1 (FM), 2005 WL 107094, at *17 (S.D.N.Y. Jan. 19, 2005) (declining to review the formality of charges issued in Bosnia and Herzegovina); *Demjanjuk v. Petrovsky*, 612 F.Supp. 571, 578 (N.D.Oh.1985) (explaining that an extradition court need not "review compliance with foreign criminal procedure"), *aff'd*, 776 F.2d 571, *rev'd on other grounds*, 10 F.3d 338 (1993) (reversing on basis of newly discovered evidence of prosecutorial misconduct by United States investigators).

Furthermore, as in *Caltagirone*, the applicable treaty provision here does not instruct otherwise. In that case, the issue was whether the extradition treaty between the United States and Italy required a showing of probable cause to authorize provisional detention of a fugitive pending a full application for extradition. The relevant article of the treaty depended on the issuance of an Italian arrest warrant. While holding that the treaty and the extradition statute did impose a probable cause requirement, the court observed that the treaty "does not contemplate a review of the validity, under Italian law, of the Italian arrest warrants." *Caltagirone*, 629 F.2d at 744; *see In re Extradition of La Salvia*, No. 84 Crim. Misc. 1(MHD), 1986 WL 1436, at *6 (S.D.N.Y. Jan. 31, 1986) ("The degree of formality with which charges are to be [leveled] in the courts of Argentina is simply not addressed in the [t]reaty.").

The same holds true for the Article XI of the Treaty, despite Skaftouros's argument to the contrary. He contends that

*Caltagirone* is distinguishable because it concerns a *"provisional* arrest warrant" for detaining a fugitive pending a full request for extradition, "for which a thorough examination of adequacy is not mandated." (Relator's Mem. at 4 n. 2 (emphasis in original).) While accurate, this distinction does not make a difference for present purposes. The "thorough examination" applicable at the full extradition hearing stage derives from the Treaty itself, and from the extradition statute. Neither requires wading into foreign criminal procedure for ruling on whether a fugitive may be extradited, any more than for provisional detention.[7]

As explained above, if anything, § 3184 arguably reduces the demanding country's burden to provide documentation to support extradition requests; it certainly does not suggest the need to examine compliance with foreign criminal procedure. As for the Treaty, it directs extradition courts to determine whether, "according to the law and the evidence, . . . extradition is due pursuant to this treaty." Treaty Art. XI. This phrase establishes the standard the demanding country must meet. In other words, it calls for evidence sufficient to support a reasonable belief that the fugitive committed the alleged violation of law. The reference to "law" thus denotes the particular criminal offense charged, not criminal procedure rules governing warrants. Moreover, as explained above, the obligation to produce "a duly authenticated copy of the warrant of arrest" to substantiate the extradition request depends on diplomatic certification, not adherence to the demanding country's criminal procedure regulations. *See id.*

For these reasons, neither the Treaty nor the extradition statute prescribes review of Skaftouros's asserted violations of Greek criminal procedure. In light of the risks posed by attempting to construe foreign law, this Court declines to consider Skaftouros's challenges to the warrant.[8] Under the Treaty, it is sufficient that Ambassador Speckhard has certified the warrant for the Relator's arrest. The question for the Court, which it addresses below, is whether probable cause supports

---

**7.** While provisional detention is not at issue, as with the United States–Italy extradition treaty in *Caltagirone,* the Treaty here does not "contemplate a review" of the adequacy of a Greek warrant under Greek law upon provisional detention in the United States. Article XI of the Treaty allows for provisional detention "in accordance with the laws of the respective countries." Treaty Art. XI. The context of Article XI makes it clear that the term "laws" in this phrase does not refer to criminal procedure laws of the requesting country. The purpose of provisional detention is to allow for the expeditious capture of fugitives when the demanding country has not yet gathered the documentation necessary for extradition. Accordingly, Article XI allows the demanding country two months to submit the supporting materials, including the authenticated copy of the arrest warrant. *See* Treaty Art. XI. As a result, countries receiving extradition requests must arrest fugitives before they would even gain the opportunity to pass on the adequacy of a foreign warrant under foreign law. Article XI thus does not admit the interpretation that it conditions provisional detention on compliance with the laws governing warrant procedures in the requesting country.

**8.** The Court only notes the effrontery of Skaftouros's argument that the Government "fail[s] to allege, let alone demonstrate," that Greek authorities attempted to properly serve him with charges, and thereby deprived him of due process in Greece. Investigators did not even gain any fruitful leads in the case, let alone learn of Skaftouros's involvement, until Petrakis gave his statement on June 21, 1990, two days after the discovery of the victim's body. (*See* Report at 13–14.) The apparent haste with which they issued the warrant for Skaftouros's arrest the next day was, of course, not fast enough: Skaftouros had fled the country in May, before authorities had any opportunity to serve him with charges.

Greece's charge that Skaftouros was an accessory to homicide.

 In addition to requesting that the Court review the warrant under Greek law, Skaftouros maintains that "the Fourth Amendment's protections extend to those arrested pursuant to treaties." *Manta v. Chertoff,* 518 F.3d 1134, 1147 (9th Cir. 2008); *see In re Extradition of Orellana,* No. 99 Cr. Misc. 1 Pg. 12(KNF), 2000 WL 1036074, at *4 (S.D.N.Y. July 26, 2000). The decisions he cites simply support the proposition that where "the United States itself acts to detain a relator pending extradition, it is bound to accord him due process." *Rosado v. Civiletti,* 621 F.2d 1179, 1195 (2d Cir.1980). Thus, where a treaty does not already do so, the Fourth Amendment binds preliminary detentions in the United States to the probable cause standard. *See Caltagirone,* 629 F.2d at 747 ("The overwhelming evidence that [the treaty] itself prohibits provisional arrest without probable cause relieves us of the need to examine the constitutional propriety of a treaty that purports to permit such arrests."); *Orellana,* 2000 WL 1036074, at *4 (requiring a warrant for provisional detention pending extradition to show probable cause, pursuant to the Fourth Amendment).

However, for present purposes, any suggestion that the Fourth Amendment creates a basis to challenge the warrant is misplaced. As explained above, now that the application for extradition has been fully submitted, the Treaty itself, and the extradition statute, already entitle Skaftouros to a review of the supporting documents for probable cause. The Fourth Amendment does not provide any additional protections. It certainly does not impose on Greece the procedures and technical requirements for issuing warrants in the United States. *See Ex Parte La Mantia,* 206 F. 330, 331–32 (S.D.N.Y.1913) (concluding that unsworn statements satisfied the Fourth Amendment's requirement of "a warrant issued 'upon probable cause supplied by oath or affirmation,'" because in extradition cases "the statute makes documents authenticated as required by law evidence," and thus "[d]epositions need not be sworn to"). The Constitution therefore supplies no grounds for opposing extradition.

## III. There is Probable Cause to Extradite Skaftouros

 Greek authorities have accused Skaftouros of being an accessory to homicide. As indicated above, he does not dispute that the charge is covered by the Treaty, which he concedes is valid and in force. Instead, Skaftouros contends that the evidence proffered against him is insufficient to support the Government's application. However, in combination, the Report, an account of what Skaftouros himself admitted to federal agents following his arrest, and a recent sworn statement from Grypeos establish probable cause that Skaftouros was an accessory to Marselino's murder.

 Skaftouros argues that the absence of sworn testimony against him in the supporting documents submitted by Greece defeats its application for extradition under the Treaty. As indicated above, Greece has provided only the June 22, 1990 arrest warrant and the Report to substantiate the request. Article XI provides that "a duly authenticated copy of the warrant of arrest in the country where the crime was committed, and of the depositions upon which such warrant may have been issued, shall be produced." Treaty Art. XI. Skaftouros proposes that use of the term "depositions" requires supporting statements to be made under oath. He therefore attacks the Report as inadequate, because it not only relies on unsworn witness statements, but does not

even include the statements themselves. This argument is unavailing.

The plain language of the Treaty does not mandate that extradition requests rest on sworn statements. Rather, Article XI commands the production of an arrest warrant and depositions "upon which such warrant *may* have been issued." *Id.* (emphasis added). Thus, the Treaty contemplates that warrants may issue without sworn depositions. In this case, the warrant for Skaftouros's arrest was not made upon any sworn statements, as on its face it refers to no auxiliary documents of any kind. The Investigating Magistrate saw fit to order Skaftouros's arrest almost immediately after Petrakis met with authorities on June 21 to describe the abduction. Of course, despite the rush to apprehend Skaftouros without waiting for sworn witness statements, it was already too late, as he had fled to Italy the month before.

 As explained above, hearsay is admissible in extradition proceedings. Upon being authenticated pursuant to § 3190, unsworn statements from witnesses may be considered. *See Collins,* 259 U.S. at 317, 42 S.Ct. 469; *Simmons,* 627 F.2d at 636. In fact, courts may even rely on summaries of unsworn witness statements submitted by law enforcement officers, provided they are properly authenticated. For instance, in *Afanasjev v. Hurlburt,* 418 F.3d 1159, 1163–64 (11th Cir.2005), the district court had relied on a bill of indictment that summarized statements by victims of the alleged crime and other witnesses. The relators argued that

(1) the document was not made under oath; (2) the witness and victim statements constituted hearsay because they were recounted by the investigator (3) the statements were not sworn or signed by the witnesses and victims; and (4) it was unclear whether the indictment was based on the investigator's personal knowledge because he never explicitly

stated that he was the individual who interviewed the witnesses and victims. *Id.* at 1163–64. However, the court held that, because the bill of indictment was "properly certified" by the appropriate diplomatic agent pursuant to § 3190, the district court "was free to consider it in determining whether to certify [the relators'] extradition." *Id.* at 1164. Similarly, in *Man–Seok Choe v. Torres,* 525 F.3d 733, 739 (9th Cir.2008), the magistrate judge had "relied on the Korean prosecutor's summary of testimony from [a] witness" to the fugitive's crimes. Although the fugitive argued that the prosecutor's summary could "[ ]not support a finding of probable cause," the court found that "if the evidence submitted in the extradition papers is certified and authenticated in accordance with [the applicable treaty and] § 3190—which is not disputed here—the magistrate judge is authorized to consider it." *Id.* at 740; *see Zanazanian v. United States,* 729 F.2d 624, 625–27 (9th Cir.1984) (finding that police reports summarizing unsworn witness statements, which the fugitive argued consisted of "multiple hearsay," were nevertheless sufficient to support an application for extradition); *In re Extradition of Neto,* No. 98 Cr. Misc. 1(THK), 1999 WL 627426, at \*5 (S.D.N.Y. Aug. 17, 1999) ("[A] police officer's report describing a witness's statement is admissible evidence in an extradition proceeding, although its reliability may be called into question.").

Accordingly, in this case, the Court may consider the Report because Ambassador Speckhard duly authenticated it in accordance with Article XI and § 3190. (*See* Johnson Decl.) "To be sure, in order to support a finding of probable cause, such hearsay statements must identify the source of the information and may not consist of conclusory or speculative statements." *United States v. Samuels,* 08–MJ–445 (RLM), 2009 WL 367578, at \*7

(E.D.N.Y. Feb. 10, 2009). The task is to "closely examine" the hearsay contained in the Report to assess whether it bears "sufficient indicia of reliability to establish probable cause." *Ben–Dak*, 2008 WL 1307816, at *4.

Not all of the Report is reliable enough to further the Government's burden in this proceeding. The Report serves as a judicial opinion justifying the issuance of indictments against the conspirators. As such, it relies on significant amounts of conjecture and inference in reasoning that the defendants must be charged with the crimes specified. In particular, wherever the witnesses attempt to exculpate themselves or their co-defendants, the Magistrates Council takes pains to expose likely falsehoods and prevarication. (*See, e.g.*, Report at 20–21 (identifying likely misrepresentations by Petrakis), 31–32 (identifying likely misrepresentations by Avramidis, Lazarou, and Grypeos).) The Report also does not consistently provide citations for factual propositions, but rather amalgamates the witness statements into a single story.

Unsurprisingly, Skaftouros lambastes the Report as unreliable hearsay. However, the Report does identify its source material, in general, to be unsworn statements from Grypeos, Agapitos, Lazarou, Avramidis, Petrakis, and Mesmerli. Furthermore, having reviewed the 71–page Report in full, the Court notes that, as a whole, it is exhaustive and specific, providing abundant details as to people, names, places, events, and dates. In the Court's opinion, this bolsters the credibility and reliability of the facts the Report alleges. *See Zanazanian*, 729 F.2d at 627 (finding police reports setting forth witness statements to be reliable because they were "abundant in detail, containing specifics of time and place, price and quantity."); *Afanasjev*, 418 F.3d at 1165 (finding a bill of indictment summarizing witness state-

ments to be reliable in part because it "list[ed] the specific dates of events, include[d] the names of witnesses and victims, and detail[ed] the amount of money that was involved in each transaction").

Moreover, neither the Report's digressions into the flaws of the witnesses' exculpatory statements, nor, indeed, the majority of the Report's reconstruction of Marselino's abduction and murder, are necessary to make out probable cause against Skaftouros. To begin with, several key statements attributed to individual sources display adequate reliability to establish a reasonable belief that Skaftouros participated in the kidnapping. The Report cites a statement from Petrakis identifying Skaftouros as one of the men who brought Marselino, in handcuffs and a hood, to his house in the early-morning hours of March 19, 1990. (*See* Report at 14.) The Report goes on to state that Mesmerli related the events of later in the day on March 19, when she cooked a meal for Skaftouros, Marselino, Grypeos, Petrakis, and Lazarou, using food that Skaftouros provided. (*See id.* at 21.) Mesmerli claimed that each of those individuals was present when Marselino made the recording used in demanding a ransom from his father. (*See id.*) Avramidis, the Report asserts, declared that he and Skaftouros drove to Haidari late one night in March 1990, and that Skaftouros briefly went inside a friend's basement apartment while Avramidis waited in the car. (*See id.* at 26.) According to the Report, Lazarou and Grypeos also confirmed that Skaftouros visited Petrakis's house during Marselino's detention there. (*See id.* at 26–27.) These statements corroborate one another in establishing that Skaftouros took part in holding Marselino for ransom at Petrakis's house. *See Afanasjev*, 418 F.3d at 1165 (noting that victim statements summarized in a bill of indictment "were consistent with each other

and were corroborated by the statements of non-victims," and thus supported the district court's probable cause determination).

To even more damning effect, the Report discusses statements from Lazarou placing Skaftouros among the group that drove Marselino out of Athens on the night of March 21. (*See id.* at 27.) While the Report quibbles with Lazarou's memory of who rode in which car, Lazarou unequivocally recalled that Skaftouros made the journey to Skourta. Most importantly, later that evening, according to the account from Grypeos summarized in the Report, he returned to the van where Skaftouros was waiting and announced to him that he had killed Marselino. (*See id.* at 29–30.) The purported confession is less important than the fact that Lazarou and Grypeos both identify Skaftouros as one of the men who conveyed Marselino to the countryside on the night of the murder. The consistency between these statements thus displays reliability in linking Skaftouros to the drive that culminated in the homicide at issue.

 That is not all. Upon being apprehended in the United States, Skaftouros admitted to agents that he supplied a car for the purpose of kidnapping Marselino. (*See* Kim Mar. 10 Ltr. Ex. B.)[9] He signed a summary of his statement to this effect transcribed by the agent who interviewed him. (*See id.*) What is material about the statement is that Skaftouros admits to knowing Grypeos and Lazarou

would use the car to kidnap the victim and hold him for ransom. (*See id.*) Skaftouros, in other words, concedes that he had knowledge of the conspiracy to abduct Marselino.[10] In addition to information supplied by the demanding country, confessions to law enforcement officials in the United States are admissible to assess whether there is probable cause to extradite a fugitive. *See Orellana,* 2000 WL 1036074, at *5 (approving, in an extradition proceeding, a court's refusal to exclude a fugitive's confession to police in the United States on *Miranda* grounds). Here, as an admission, and thus a well-established hearsay exception, Skaftouros's statement is reliable. *See* Fed.R.Evid. 801(d)(2) (providing for admissibility of out-of-court admissions of party-opponents); *see also United States v. Kin–Hong,* 110 F.3d 103, 121 (1st Cir.1997) ("[W]e note that the Chui statement might well be admissible under United States law as a statement against interest. The magistrate judge correctly ruled that the . . . statement [was] not unreliable.") (internal citations omitted); *see generally United States v. Saget,* 377 F.3d 223, 230 (2d Cir.2004) (identifying hearsay exceptions as supplying traditional indicia of reliability for purposes of admitting non-testimonial hearsay in criminal proceedings). Although Skaftouros does not admit to any acts other than procuring a car, his confirmation that he was, in fact, aware of the scheme to abduct Marselino reinforces the credibility

---

9. Although the Report explains that Avramidis owned the car in question, this is not necessarily inconsistent with Skaftouros's statement to investigators, in which he apparently claimed the car was his own father's. Avramidis had both married Skaftouros's cousin and worked for Skaftouros's father, in exchange for which he was given an apartment free of rent, according to the Report. (*See* Report at 25.) Skaftouros may have simply considered the car as belonging to his family, of which

Avramidis was a part, notwithstanding the fact that Avramidis formally owned the vehicle. Furthermore, if true that Skaftouros's father in fact owned the car, Skaftouros's statement is actually more inculpatory than the Report.

10. As indicated above, on its own, this would appear to create probable cause sufficient to charge Skaftouros with kidnapping a minor for ransom.

of the Report in portraying Skaftouros as a member of the conspiracy.

■ Skaftouros counters the Government's submission by supplying an affidavit from Grypeos purporting to exonerate Skaftouros. (*See* Translation of Affidavit of Stamatis Gripaios [sic], dated Sept. 26, 2008 ("Grypeos Aff.").) The thrust of the affidavit is that Skaftouros had no knowledge of the homicide, and neither planned to kill Marselino nor assisted Grypeos, Spinaris, and Agapitos in the deed. While the parties dispute whether the Court may properly consider the Grypeos affidavit as "explanatory evidence," or whether it instead constitutes inadmissible "contradictory evidence," *see In re Sindona,* 450 F.Supp. 672, 675 (S.D.N.Y.1978), there is no need to resolve this question. Even considering Grypeos's statements, and even assuming that Grypeos truly believes Skaftouros did not know about the murder, the affidavit cannot prevent Skaftouros's extradition.

Grypeos, in fact, inculpates Skaftouros. He now declares that Skaftouros "helped us to transfer the victim to his uncle['s] sheep pen, which is located in a desert[ed] place, ... in which ... Skaftouros's uncle rested in summer." (Grypeos Aff. at 1.) Leaving aside whether the remainder of the affidavit can be credited, this statement further corroborates two crucial aspects of the Report. First, it confirms the two earlier representations from Lazarou and Grypeos himself that Skaftouros drove with Marselino to the property north of Skourta. Second, it corroborates the allegation that the sheepfold where Grypeos ended Marselino's life did, after all, belong to a relative of Skaftouros.[11] In this respect, the consistency between the Report

and Grypeos's affirmation demonstrates the reliability of these two facts.[12]

In this way, Grypeos removes any doubt that there is probable cause to believe Skaftouros was an accessory to murdering Marselino. Purged of supposition, the reliable elements of the Report, the Grypeos affidavit, and Skaftouros's own admission establish the following:

1. Skaftouros knew of the plot to abduct Marselino for ransom. (*See* Kim Mar. 10 Ltr. Ex. B.)

2. More than once, Skaftouros visited the house where Marselino was imprisoned, where he had contact with Marselino. (*See* Report at 14, 21, 26–27.)

3. On one or more occasions, Skaftouros helped procure a car to use in transporting Marselino. (*See* Kim Mar. 10 Ltr. Ex. B.; *see also* Report at 25–27.)

4. On the night of March 21, 1990, Skaftouros accompanied at least Grypeos, Lazarou, and Avramidis in smuggling Marselino out of Athens to an uninhabited area in the countryside north of Skourta. (*See* Report at 27, 29–30; Grypeos Aff.)

5. At the end of this journey, Grypeos shot Marselino at a sheepfold belonging to a relative of Skaftouros. Skaftouros then drove back to Athens with the rest of the men, but without Marselino. (*See* Report at 11–13, 29–30; Grypeos Aff.)

Skaftouros thus participated in driving a person he knew was being held for ransom into a deserted area late at night, and then returned to the city without the hostage, whose body was later discovered at the site. There can be little doubt that Skaftouros also was instrumental in choosing his own relative's secluded property as the

---

11. Any conflict between Grypeos's statement and the Report, which suggests that Skaftouros and Christos Agathis are cousins, is not material. There is no question that the land belonged to a relative of Skaftouros.

12. Skaftouros in effect concedes these facts are true, insomuch as he is the one who presented Grypeos's declaration to the Court.

destination for the kidnappers and the victim on the night of his death. These circumstances support a reasonable belief that Skaftouros knowingly assisted a homicide. They raise the inference that Skaftouros either knew from the outset that the purpose of the trip was to kill Marselino, or, at a minimum, realized Marselino had been murdered once he did not make the return journey to Athens, and then aided the perpetrators by concealing the crime.[13] *See In re Ntakirutimana*, No. Civ. L–98–43, 1998 WL 655708, at *29 (S.D.Tex. Aug. 6, 1998) (basing a finding of probable cause to extradite a fugitive to face charges of genocide on statements from witnesses who observed that a fugitive was present during attacks on victims but did not see the fugitive actually kill anyone).

At trial, Skaftouros may very well raise a defense that he did not know Marselino had been killed until weeks or months after his death. Grypeos's representations amount to a denial that Skaftouros possessed the necessary culpable mental state to be complicit in the murder. In this proceeding, however, Skaftouros's argument, and Grypeos's affidavit, do not sufficiently explain Skaftouros's conduct to rule out a finding of probable cause. Regardless of what Grypeos may or may not believe, the evidence suffices to raise an inference that Skaftouros intended to assist the execution. *See United States v. Greene*, 108 F. 816, 819–20 (S.D.N.Y.1901) (approving a finding of probable cause based on facts and circumstances giving rise to an inference of the necessary *mens rea*); *Oen Yin–Choy v. Robinson*, 858 F.2d 1400, 1408 (9th Cir.1988) (approving the inference of criminal intent from inculpatory circumstances pursuant to a proba-ble cause determination in extradition proceeding).

Finally, the credible evidence summarized above establishes a pattern of events that sharpens the Report's depiction of Skaftouros as one of the principal architects of Marselino's abduction and murder. Skaftouros has admitted to knowing about the kidnapping and supplying a car for that purpose. Marselino's body was found on property belonging to a relative of Skaftouros. Grypeos, Lazarou and Avramidis, each of whom worked for Skaftouros's father, have all given statements admitting to some degree of involvement in the events leading to Marselino's death. Thus, it is reasonable to conclude that, as the Report alleges, Skaftouros acted as a hub for several spokes of the conspiracy-that, after accepting the proposal from Spinaris and Agapitos to help kidnap Marselino, he recruited Grypeos and Lazarou to perform the necessary physical violence; procured transportation with the help of Avramidis; and, ultimately, found a quiet place to execute the victim.

In sum, the reliable evidence before the Court supports a reasonable belief that Skaftouros was an accessory to Marselino's murder. The Government has therefore established probable cause to extradite Skaftouros to stand trial on that charge.

## CONCLUSION

Because Skaftouros is subject to extradition under 18 U.S.C. § 3184 and the Treaty, the Government's application for a certificate of extraditability for Skaftouros is GRANTED. The Court therefore CERTIFIES Skaftouros as extraditable and refers this matter to the Secretary of State

---

**13.** There is no evidence about how far from the sheepfold the kidnappers parked the van, in which Skaftouros was waiting. Yet, as the Report points out, it may be fair to assume that it was close enough for Skaftouros to hear the gunshots, and realize at that point that Marselino had been dispatched.

for her determination of whether to surrender Skaftouros to authorities in Greece. The Court further ORDERS that Skaftouros shall remain in the custody of the United States Marshals Service pending the Secretary of State's decision.

So Ordered.